658 So.2d 324 (1995)
Cheryl S. BASS
v.
FARMER & CHEATHAM and State Farm Fire and Casualty Company.
No. 94 CA 1281.
Court of Appeal of Louisiana, First Circuit.
June 30, 1995.
Rehearing Denied August 17, 1995.
*325 Fernand L. Laudumiey, III, New Orleans, for plaintiff-appellee, Cheryl Bass.
Denis P. Juge, Metairie, for defendants-appellants, Farmer & Cheatham and State Farm Fire & Cas. Co.
Before GONZALES and PARRO, JJ., and REDMANN[1], J. Pro Tem.
WILLIAM V. REDMANN, Judge Pro Tem.
In this worker's compensation claim for disability from mental injury from mental stress, the hearing officer found that plaintiff legal secretary's posttraumatic stress disorder (PTSD) was caused by "extremely tragic events" (including sexual abuse from age 5 to 12 and triple rape at 15) long before her employment at age 24. The hearing officer awarded disability benefits, ruling that being screamed at and having a book slung in her direction at work "were the sudden and unexpected and extraordinary events that triggered the latent PTSD into full blown active PTSD which disabled claimant," entitling claimant to benefits.
We reverse. Although PTSD is a mental injury with diagnostic criteria within La.R.S. 23:1021(7)(d), the loss of ability to cope with pre-existing mental injury is not itself shown to be a similarly compensable mental injury. In any event, plaintiff did not demonstrate by clear and convincing evidence a sudden, unexpected, and extraordinary stress related to her employment as further required by R.S. 23:1021(7)(b) for compensability.

Applicable law
Special statutes apply to worker's compensation claims for disability from mental injury caused by mental stress, and impose special burdens of proof.
R.S. 23:1021(7)(b) and (d) (added, Acts 1989 No. 454; as amended, Acts 1991 No. 468) deny compensability unless both:
(1) "the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence,"
and
(2) "the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association."[2]
*326 Proof by clear and convincing evidence is described by the Louisiana supreme court in Succession of Lyons, 452 So.2d 1161, 1165 (La.1984) (emphasis in original):
Generally, this third burden of proof requires more than a "preponderance of the evidence" but less than "beyond a reasonable doubt". The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence. Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976). This standard is usually employed "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds." McCormick on Evidence, Section 340(b), p. 798 (2nd ed. 1972).

Plaintiff's PTSD caused by pre-employment events
Reports and hospital and office notes from plaintiff's psychiatrist Dr. Denney and his associated psychologists, Dr. Culver (who testified by deposition) and Dr. Hanawalt, and testimony and reports from defense psychiatrist Dr. Roniger, reasonably establish plaintiff's PTSD within the DSM-III-R criteria and its disabling effects. But plaintiff did not prove, and especially not by clear and convincing evidence, that (as she contended) comparatively minor incidents at work were the cause of her PTSD.
To the contrary, the record fully supports the hearing officer's finding that plaintiff's PTSD was caused by events that long pre-dated her employment. Most conspicuous were sexual abuse from age 5 to age 12 and three-man rape at age 15.
The hearing officer found that the PTSD was caused by the extremely tragic events in claimant's life prior to her becoming employed by Farmer and Cheatham. These events included: depression, drug use,[3] molestation as a child,[4] gang raped[5] as a teenager, death of two persons close to claimant,[6] eating disorder and obsessive *327 behavior, prior divorce and marital problems, prior mental treatment.[7]
Obviously gang rape and childhood sexual molestation are more comparable to DSM criterion A's "serious threat to one's life," but one may add other specifications to the hearing officer's list of pre-employment tragedies: interpersonal difficulties with her parents, living as a child with grandparents and with an aunt; uterine cervical cancer and ultimately hysterectomy; an automobile accident resulting in concussion, seizures, and four-year-later memory lapses hospital records say "global amnesia"); marriage at 17 for 5 years to an abusive husband; and, continuing up to trial time, lesser but pervasive difficulties (in "interpersonal relationships") with her second husband requiring continuing psychotherapy.
Defense psychiatrist Dr. Roniger diagnosed "elements of delayed posttraumatic stress disorder from childhood molestation and adolescent rape. A great deal of evidence supporting a diagnosis of borderline personality disorder. By that I mean life-long maladapted pattern that has to do with instability of feeling, thinking, and also instability of relationships."
Plaintiff's psychologist Dr. Culver also diagnosed PTSD, but he attributed it to the alleged book-slinging incident, which he said "was a life-threatening event" within DSM-III-R. He appeared to evaluate the "life-threatening" quality of the incident from a subjective point of view, namely that of a mentally ill plaintiff. One may agree that stress affects different persons differently, but DSM criterion A's requirement of a trauma on the order of "a serious threat to one's life," especially when made a legal requirement by La.R.S. 23:1021(7)(d) and coupled with the clear and convincing burden of proof, must be deemed an objective standard. Whether a given event is a serious threat to one's life (or on that order) is a question of fact for the trier of fact to be decided on an objective evaluation. The psychologist's opinion cannot be deemed clear and convincing proof of his position. The hearing officer correctly rejected the book-slinging as the cause of the PTSD.

Loss of ability to cope with pre-existing mental injury not itself a compensable mental injury
La.R.S. 23:1021(7)(d) provides that no mental injury or illness is compensable unless its diagnosis meets the criteria of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.
There is no evidence in this record, much less clear and convincing evidence, that loss of ability to cope with a pre-existing mental injury is itself a mental injury or illness, or that its diagnosis meets the criteria of the DSM.
Stress at work may have contributed to plaintiff's loss of her prior ability to cope with the tragedies causing her PTSD, but did not cause a compensable mental injury within R.S. 23:1021(7)(d).

No "sudden, unexpected, and extraordinary stress related to the employment"
Furthermore, R.S. 23:1021(7)(b) requires proof of "a sudden, unexpected, and extraordinary stress related to the employment... demonstrated by clear and convincing evidence."
The hearing officer, after holding that the PTSD was caused by dire pre-employment tragedies, continued:
However, despite all of these, claimant was an exemplary employee prior to the book throwing event and the public humiliation by Mr. Farmer. The treating physician *328 [sic; psychologist] Dr. Culver testified that claimant was coping with the latent PTSD UNTIL the two events with Mr. Farmer. These events were the sudden and unexpected and extraordinary events that triggered the latent PTSD into full blown active PTSD which disabled claimant.
The "public humiliation" (also called a "verbal attack" by the hearing officer) was Farmer's "screaming [in a client's presence] about, you know, she [his own secretary] was not supposed to get the phone; why didn't you [plaintiff] get it.... I was embarrassed." She was embarrassed, she testified on cross-examination, "on behalf of the firm."[8] Considering that testimony, together with the testimony of frequent yelling by Farmer (and plaintiff's admission that "both you and Mr. Farmer had [their] temper tantrums"), we cannot consider this incident sudden, unexpected, or, especially, extraordinary, merely because a client observed it.
The "book throwing event" (which the hearing officer also called a "physical attack") was defendant Farmer's having picked up a book from his desk and, in plaintiff's own lesser words, "slung it in my direction" in anger not at plaintiff but at a client's message (relayed by plaintiff) that the client was firing Farmer.[9]
That was the event that plaintiff contends was a "sudden, unexpected, and extraordinary stress related to the employment" that satisfies § 1021(7)(b) (and, plaintiff contended, caused her PTSD). But the evidence is unclear, and unconvincing.
Perhaps the most unconvincing aspect of the evidence about this alleged event is that, notwithstanding that psychotherapeutic probing began six weeks after the alleged event and continued through months of psychiatric hospitalization with near daily individual and group sessions, and then through individual psychotherapy more often than weekly, with notes from all sessions plus several formal reports, there is no mention of throwing a book at plaintiff in any written record until after plaintiff got a new lawyer. That was almost a year after she went to the hospital.[10]
*329 Even at trial, plaintiff does not give clear and convincing testimony of any "physical attack" upon her with a book. Her words describe a lawyer angry, but not angry at her, and a book "slung ... in [her] direction" rather than "thrown at" her.
The hearing officer recites that "claimant testified that Mr. Farmer threw a law book at her but it missed her head hitting the wall behind her.... She was quite sure that the book was thrown at her." (Our emphasis.)
We do not find support for those emphasized recitals in the transcript of plaintiff's testimony or elsewhere. Plaintiff does not testify the book was a law book. Psychologist Dr. Culver in his deposition says law book, and, indeed, he says very large law book. (He thought throwing it at her "was a life-threatening event.") Nor does plaintiff say it "missed her head hitting the wall behind her"; she testifies it hit "a bookcase like just to the side of me." Nor do her words convey that she was "quite sure" that the book was "thrown at her," rather than "slung in [her] direction." She testified:
And I went into his office and told him, and he blew up and said, you know, fine, let them get them a good attorney and went on about the case. And while he was going on about fine, let them get them a good attorney and get someone competent or whatever, and he picked up a book off of his desk and slung it in my direction. And it hit theit was a bookcase like just to the side of me to the right, and it hit there. Q. Did that cause you any concern? A. It scared me. I had never seen him throw anything, not atyou know not at someone before. Maybe thrown a pack of cigarettes down or a file down or some thing, but that was like down at the ground, not in someone's direction. [Emphasis added.]
Fellow secretary Sheila Griffith's testimony of plaintiff's contemporaneous report to her suggests her understanding that possibly it was not a book but the client's file that the angry Mr. Farmer threw. Ms. Griffith testified that the event had not made a great impression on her (she earlier told an insurance adjuster she did not recall any unusual event). She testified that plaintiff
had to tell Mr. Farmer that the client wanted his file.... Then she came back.... She was upset and she said that I can't believe that that son-of-a-bitch did that. I said what did he do, and she said he threw it at me. She did notI don't remember her saying he threw the book at me. I don't know. She just said he threw it at me.
Also raising doubt that Mr. Farmer threw a book at plaintiff is plaintiff's own light treatment of the alleged incident:
Q. The book throwing incident I'm talking about.... [D]o you have any idea about when this time period would be? A. I know it was before the Fourth of July holiday. It would have been like the week before leading up the Fourth of July holiday 1992. Q. After this took place, did you give any consideration or thought about your job, or what decisions did you make after that? A. I talked to my husband about leaving the firm, and I gave my resignation to Mr. Cheatham one afternoon, the last working day before the Fourth of July. I told him I think the next day or within a couple of days that I wasn't *330 leaving; I would stay. And we met and the two attorneys and two secretaries got together, and there were changes going to be made and to make things easier on us and try to improve the situation some. So I stayed.
Ms. Griffith confirms the meeting and adds that the two secretaries planned to resign together; but, she testifies, there was no mention of any book-throwing:
Q. [I]n July, was the plan for both of you to resign and start a temporary service? A. Right.... Q. But apparently Cheryl changed her mind and decided to continue to work, and so did you? ... A. Yes, sir. I gave ... Mr. Farmer my resignation, and then the following Monday we all sat down in the conference room and, you know, hethey asked me, and I told them that yes, you know, I would stay there....
Q. Did you and Cheryl both sit and speak with Mr. Cheatham concerning the resignation? A. Uh-huh (affirmative response). After the day that I met Mr. Farmer and gave him my resignation. Q. When the two of you were speaking with Mr. Cheatham, do you recall Cheryl saying anything to Mr. Cheatham about a book having been thrown at her? A. No. She was crying and she was sayingwe had both told Mr. Cheatham that Mr. Farmer had been behaving badly, but notnot to my knowledge. I don't remember that. Q. Was there anything specific about what was concerning her about Mr. Farmer at that meeting? A. Yes. That he wouldn'tif she gave him work ... he wouldn't look at it.... Q. Specifically at that meeting, you don't recall any comments by her for the reason for quitting was that someone threw a book at her or caused her any particularA. She just couldn't take it anymore.... Q. Did Cheryl mention anything to you later about either the [screaming] incident at the copy machine or this throwing incident? A. No.
Defendant Cheatham enjoyed the confidence of plaintiff and Ms. Griffith. His testimony agreed with Ms. Griffith's that plaintiff did not mention any book-throwing. "She said at that time that she just didn't like working there anymore, that she had plans along with Sheila to open up a freelance secretarial service.... If she had said anything about Mr. Farmer throwing a book or if Sheila had said anything about it, I would have confronted Mr. Farmer about it. Nothing was ever said to me about any book throwing incident." Indeed, he testified that he had never heard of the book-throwing allegation until "a couple of days before trial."
Dr. Denney, plaintiff's treating psychiatrist, in his report dated 10/1/92, does not mention any book-throwing. He states that in his "professional judgment, the depression and suicidal behavior [his admission diagnosis] was caused by multiple stressors on the job from 6/85 up to her admission." Those multiple stressors may have participated in eroding plaintiff's "fragile sense of self" that had enabled her to suppress and withstand her calamitous past, and so contributed to her loss of ability to cope with it further. But, in the first place, there was no last straw that, when imposed on plaintiff immediately broke her fragile psychological back: it was six weeks from the alleged book incident until plaintiff's hospitalization. And, in the second place, multiple stressors over seven years, at least after a while, are neither "sudden, unexpected, [nor] extraordinary" within R.S. 23:1021(7)(b).
Plaintiff did experience many stresses on the job (and apparently herself contributed to them[11]). But plaintiff did not by clear *331 and convincing evidence prove any sudden, unexpected, and extraordinary stress related to her employment as the law requires.

Decree
The judgment appealed is reversed and plaintiff's claim is dismissed at plaintiff's cost.
NOTES
[1] Judge William V. Redmann, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] At the time of plaintiff's claim DSM-III-R was current. Its criteria for posttraumatic stress disorder are:

A. The person has experienced an event that is outside the range of usual human experience and that would be markedly distressing to almost anyone (e.g., serious threat to one's life or physical integrity ...)
B. The traumatic event is persistently reexperienced in at least one of the following ways: (1) recurrent and intrusive distressing recollections...[;] (2) recurrent distressing dreams of the event[;] (3) sudden acting or feeling as if the traumatic event were recurring ...[;] (4) intense psychological distress at exposure to events that symbolize or resemble an aspect of the traumatic event ...
C. Persistent avoidance of stimuli associated with the trauma or numbing of general responsiveness..., as indicated by at least three of the following: (1) efforts to avoid thoughts or feelings associated with the trauma[;] (2) efforts to avoid activities or situations that arouse recollections of the trauma[;] (3) inability to recall an important aspect of the trauma...[;] (4) markedly diminished interest in significant activities ...[;] (5) feeling of detachment or estrangement from others[;] (6) restricted range of affect ...[;] (7) sense of a foreshortened future ...
D. Persistent symptoms of increased arousal... as indicated by at least two of the following: (1) difficulty falling or staying asleep[;] (2) irritability or outbursts of anger[;] (3) difficulty concentrating[;] (4) hypervigilance[;] (5) exaggerated startle response[;] (6) physiologic reactivity upon exposure to events that symbolize or resemble an aspect of the traumatic event ...
E. Duration of the disturbance ... of at least one month Specify delayed onset if the onset of symptoms was at least six months after the trauma
[3] Plaintiff's psychologist Dr. Hanawalt notes in hospital records a month after admission: "She shared that for the last 3-4 years she has smoked pot daily all day long. In addition she has been addicted to diet pills...." Plaintiff testified, at trial, that her marijuana use was daily only "maybe two weeks or so before I went in ... [and only] occasionally over the past three years... once a week or so." Defense psychiatrist Dr. Roniger reports her statement of using marijuana "almost daily prior to admission to the hospital" and deemed that an element contributing to the depression that led her to seek hospitalization.
[4] The reasons later note "repeatedly molested," and the record shows from age 5 to age 12; one doctor quotes plaintiff, "I think it was an uncle."
[5] Although "gang rape" is reported in some hospital and therapist records, in some the multiple rapists are identified as a boyfriend and two of his friends.
[6] Plaintiff testified only about the 1990 death of a cousin. On direct: "I was upset about her dying when she died because it was an unexpected death. But, you know, I mean no more than anybody would be upset about a death of someone." On cross: "Q. In September of 1990 your cousin, Linda, died? A. Right. Q. This was someone who you were very close to? A. Yes, sir. We were raised together. We were close." Further, her psychiatric evaluation by Dr. Denney on hospital admission August 8, 1992 states "Ms. Bass is unable to identify any significant causes of her depression although recent stressors are as follows: 1) the death of a cousin to whom she was close approximately two years ago; 2) job is high stress; 3) father has been anticipating back surgery and has been a chronic low back pain patient." Note also hospital "individual/group notes" of August 17 by Dr. Denney: "She talked about having a pass and insisting to her husband that she must visit the cemetery alone to begin to reconcile herself with her dead loved ones. She said it was extremely hard to go and it involved her pulse racing and she was constantly tearful, but that the process produced in her a feeling of relief she liked. She seems to have made a courageous first step in beginning to face her grieving." Notes of August 20: "She seems more hopeful and is in the process of writing a letter to her cousin who was the most recent loss in her life, and with whom she had unfinished business."
[7] This presumably refers to treatment for seizures and (about four years later) global amnesia from a 1977 or 1978 automobile accident in which plaintiff suffered a concussion from hitting her head on the windshield.
[8] Plaintiff testified: Q. Can you tell us about those two events. A. One was I was helping a client. I was running copies for her back in the copy room one afternoon, and she was standing back in the copy room with me. And the telephone rang, and I guess Mr. Farmer's secretary had picked up the phone. And he came in there and whereI'm sorry. He came into the copy room where I was and was screaming about, you know, she was not supposed to get the phone; why didn't you get it. We were back there in front of the client. Q. How did you feel about that? A. I was embarrassed. I mean, we had alwaysI mean, I don't know. Here again, it's like a confidentiality nature. I know attorneys' offices have confidentiality and all, but there it was like you keep your private business private and you don't let on to your troubles and stuff in front of a client. So it embarrassed me that, you know, it happened in front of a client. It upset me real bad....

[On cross:] Q. In reference to this event at the copy machine when you claim that Mr. Farmer was yelling at you in the presence of a client, I pointed out that you apparently were just embarrassed on behalf of the firm, and you said ["]yes. I mean, he's always had a temper. He's on occasion thrown books across the room and things like that, but he's never done it in front of a client.["] A. Right. [All emphasis added.]
[9] Q.... What would have been the second event? A. The second one, I'm really not sure if it occurred that same afternoon or if it was the next day, but it was within that same period. A client had called the office or stopped by. I'm not sure which. But at any rate, they were coming by to pick up a personal injury file that they wanted to pick up their file and find another attorney basically. I had to go into Mr. Farmer's office and tell him, you know, that they were coming for the file or they were there for the file or whatever. And I went into his office and told him, and he blew up and said, you know, fine, let them get them a good attorney and went on about the case. And while he was going on about fine, let them get them a good attorney and get someone competent or whatever, and he picked up a book off of his desk and slung it in my direction. And it hit theit was a bookcase like just to the side of me to the right, and it hit there. Q. Did that cause you any concern? A. It scared me. I had never seen him throw anything, not atyou know, not at someone before. Maybe thrown a pack of cigarettes down or a file down or something, but that was like down at the ground, not in someone's direction. [All emphasis added.]
[10] Plaintiff testified on cross: "Q. Dr. Culver's office notesand this is after the hospitalization, and I don't have a good copy of the date, but I think July of '93 is probably correct, July 26. You fired your attorney and was [sic] dissatisfied. You went to a library to research the civil code. Did you check in the civil code to see what was required in order to maintain a claim for mental disability? A. No, sir. The library at Southeastern isn't that extensive. I went and looked through the civil code books, and I found basically a few references to workers' comp, but it wasn't anything specific. Q. Did anybody at some point tell you that it was necessary to identify a particular traumatic event? A. I'm not sure. I mean, I know now that it's that you identifythat there has been a traumatic event, but I guessI mean, I'm not sure if someone told me or if it was just identified. Q. So apparently sometime in the doctor's notes you made reference to having discharged your attorney and having done some research on the civil code? A. I would have searchedit would have been more like at the library at Southeastern is very limited. [Sic.] Q. Then we haveand I'm not sure whether this is August 9th, '93 or what. Maybe your records might be better. New attorney. He makes notes of a new attorney being in the case. This is the first time that we have reference to the discussion about somebody throwing anything in August of '92. Would that be your recollection of when you first had some recollection of this book throwing? A. I don't understand by recollection [sic; "my recollection"?]. I mean, it's not [sic; "as" or "like" omitted?] it was with the sexual abuse where it was blocked out of my mind or anything. I mean, I talked to my husband about it. Q. So it wasn't important until you got a new attorneyA. It was obvious.
[11] "Plaintiff herself testified: Q. Would it be correct to say that both you and Mr. Farmer had your occasions of temper tantrums? A. Yes, sir, it would.

Ms. Griffith testified: Q. From your experience during the years that you were there, did you notice on occasion that Cheryl in fact had her own moments of being rather verbally abusive to other people? A. Yes. Cheryl couldI don't know if it's verbally abusive, but Cheryl got her point across. I mean, she could get her point across. Q. Did she sometimes scream at others or just plain scream? A. Well, I don't know if she just sat at her desk and screamed, but there were times that even methe one time that I can think of was that I had been off or whatever and my desk was a total wreck, and she had to find something and so she had to clean up. And so when I came back she said the next time, you know, you leave this place or whatever. Q. Did you ever notice her yelling at Mr. Cheatham? A. Yes. There was oneonly one time thatwell, I take that back. I mean, you know, yell at Mr. Cheatham or whatever. But there was one time whenand this was in July that she broke down she screamed. Mr. Cheatham was on the phone with someone and they needed a piece of paper, and he came and asked CherylCheryl was typing a document.... She said not now; I mean, I have to get this out. This right here, but I promise I'll get it today but not just right this second. Mr. Cheatham went into his office and picked up the phone and said okay, my secretary is going to FAX it right now. So when he hung up the phone, Cheryl jumped up and said I told you, you know, I've got too many things to do. I just can't face this right now. She was talking loud or whatever. She just burst into tears, you know. She just said she couldn't take it anymore. I remember that was after her vacation and in July because Mr. Cheatham had even said Cheryl, you know, you just had three weeks vacation."