679 So.2d 603 (1996)
Peggy RENTER, Plaintiff-Appellant,
v.
WILLIS-KNIGHTON MEDICAL CENTER, Defendant-Appellee.
Nos. 28589-CA, 28590-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1996.
*604 Lunn, Irion, Johnson, Salley & Carlisle by Frank M. Walker, Jr., Shreveport, for Plaintiff-Appellant.
Wilson & Stephens by David Paul Wilson, Shreveport, for Defendant-Appellee.
Before SEXTON, NORRIS and WILLIAMS, JJ.
NORRIS, Judge.
In this workers' compensation case, claimant, Peggy Renter, alleged injury resulting from two incidents arising out of and in the course of her employment with Willis Knighton Medical Center ("WKMC"). The two incidents were consolidated at the Office of Workers' Compensation ("OWC") and the first injury (back injury) was not made part of this appeal. After a hearing on February 7, 1995, the hearing officer ruled in favor of the defendant finding that Ms. Renter failed *605 to meet her burden of proof. Ms. Renter appeals from that decree and asserts four assignments of error. For the reasons expressed, we affirm.

Facts and procedural history
On September 19, 1992, Ms. Renter, a registered nurse, was working in the psychiatric unit at WKMC. As part of her normal rounds, she went to check on a patient who, according to Ms. Renter, was under close supervision due to her suicidal tendencies (Nurse Joiner, her supervisor, testified she did not believe the patient was under a suicide watch). Ms. Renter entered the patient's room, but could not find her; she called the patient's name several times with no response. She called again at the closed bathroom door; still getting no response, she entered the bathroom. There she found the patient in a bathtub full of water with her head back and her hair floating on the water. Believing the patient had committed suicide by drowning, Ms. Renter became hysterical, started screaming and urinated on herself. Other testimony at trial revealed that the patient neither committed nor attempted suicide; she was simply taking a bath with her head back washing her hair.[1]
After this incident Ms. Renter reported to the emergency room and was diagnosed with anxiety problems and possible cardiac problems. She was treated for high blood pressure, given medication and discharged home a few hours later. Upon her return home, she went to bed; according to her husband, she slept until the next day.
After Ms. Renter awoke, two other events of note occurred. First, she was drinking from a glass of water or juice and purportedly saw her dead son in the bottom of the glass. Second, she went to take a bath but as she stepped into the bathtub she believed she stepped on her dead son's stomach. Ms. Renter was subsequently treated at Schumpert Medical Center by Dr. Juliana Fort. The record discloses evidence that Ms. Renter's only son died from drowning in 1968 and her pregnant niece committed suicide by drowning some three years prior to the WKMC incident.

Medical Testimony
Dr. Fort, a licensed psychiatrist, testified that she treated Ms. Renter from September 21, 1992 until December 15, 1993. She diagnosed Ms. Renter with Post Traumatic Stress Disorder ("PTSD"), depression and multiple personality disorder. Dr. Fort felt that the PTSD was the primary disabling illness and it was traceable to the WKMC event. However, she was unable to determine which condition rendered Ms. Renter unable to function on the job.
Because Ms. Renter told Dr. Fort she had coped fine after the drownings until the 1992 incident, Dr. Fort felt the previous events coupled with the 1992 incident caused the PTSD symptoms to emerge. However, Dr. Fort admitted she could not definitively relate Ms. Renter's psychiatric problems with any particular event without an accurate medical and work history which she felt was crucial to a proper diagnosis.
Dr. Fort referred Ms. Renter to Dr. Ronald Goebel for psychotherapy. Dr. Goebel, a licensed psychotherapist, saw plaintiff 13 times between March 10, 1993 and September 1, 1993. He agreed with Dr. Fort's diagnosis of PTSD and depression, but did not see evidence of multiple personality disorder. Dr. Goebel testified PTSD is caused when a person is subjected to a stressor that is beyond the normal range of experience of most individuals. He stated Ms. Renter suffered flashbacks involving somebody drowning and that flashbacks were normally evidence of PTSD. Likewise, Dr. Geobel felt that the incident at WKMC would probably not have triggered an emergence of the PTSD symptoms had she not tragically lost her child by drowning.
Furthermore, Dr. Goebel also could not determine whether the incidents occurring at her home after the WKMC incident were flashbacks. However, he accepted the work *606 history she related, to the effect that she was functioning properly prior to the WKMC incident. Thus, he determined the 1992 incident was likely a triggering mechanism for the emergence of the PTSD symptoms.
Dr. Keith Kessel, a psychiatrist, saw plaintiff on a referral from Dr. Fort and treated her from March 30, 1994 through the time of trial. He concurred in Dr. Fort's diagnosis of PTSD after he learned of the drowning in 1968 and Ms. Renter's subsequent hospitalization. He concluded since the drowning was very stressful and outside normal experience, it was the precipitating event for the PTSD. Although Ms. Renter was thereafter able to subsist with the PTSD for several years, the 1992 WKMC incident triggered the reemergence of the symptoms. He felt the PTSD was what kept plaintiff from working. He believed that her "borderline" personality problem (which he attributed to a tumultuous childhood and sexual abuse) led her to misinterpret the 1992 incident; his original information was that a patient had actually drowned at WKMC. He testified that an actual drowning would be more likely to trigger claimant's PTSD; however, a misinterpretation of the incident may have the same effect. In fact, he felt it was possible that her seeing anyone in a bathtub might precipitate emergence of the symptoms. He believed Ms. Renter's day to day experiences would affect the degree to which the PTSD would be symptomatic.
In sum, Dr. Kessel felt the PTSD predated the WKMC incident, but that incident triggered the recurrence of symptoms, provided the history he had was accurate. The effect of the hospital incident stressor would end at some point but other stressors would again trigger the same condition. Dr. Kessel testified he could not state with certainty when the 1992 incident would cease triggering her PTSD. Likewise, he declined to say if that event would maintain her PTSD symptoms for the rest of her life, or even that it was doing so in January 1995.[2]
Dr. Paul Ware, psychiatrist, testified at trial for the defendant. He had extensive experience in treating PTSD as well as personality disorders and has written and lectured extensively on both subjects. Ware saw plaintiff on April 6, 1994 at defendant's request and did both neurological and psychiatric evaluations. Ware had been furnished and read the hospital records, the depositions of the treating physicians, and had also listened to portions of plaintiff's testimony.
Dr. Ware testified after the 1992 incident, Ms. Renter suffered from an acute anxiety reaction or attack which caused fright, elevated blood pressure and an increased pulse. However, he believed the effects of this lasted for less than 24 hours. He also felt that her pre-existing PTSD was caused by the drownings of her son and niece, and that the WKMC incident at best functioned as a stimulus (among many) for the emergence of PTSD symptoms. Other life experiences could also serve as similar stimuli. Dr. Ware stressed that an accurate work history and medical history was critical to a valid diagnosis. He demonstrated concerns in this regard because he candidly stated Ms. Renter exaggerated symptoms to benefit herself.
Dr. Ware reiterated that the psychiatric effect of the WKMC incident in 1992 ended after plaintiff went home and slept. After she got up and started to drink water, this triggered the latent PTSD anew. The attempt to bathe was another triggering stimulus. Ware was of the opinion that if the WKMC incident was still operating after plaintiff arose, plaintiff would not have attempted to take a bath. He interpreted the medical evidence to show that the 1992 incident may have triggered the emergence of symptoms of the underlying PTSD, but that other events unrelated to her employment were responsible for making the symptoms persist over 24 hours.

Action in the OWC
In response to Ms. Renter's claim for benefits, WKMC argued that her injuries did not arise from a compensable accident under the workers' compensation act (the "Act") and alternatively that the injuries are not disabling. In denying Ms. Renter's claims, the hearing officer found that the plaintiff failed to demonstrate by clear and convincing evidence *607 that she incurred a mental injury or illness as a result of a sudden, unexpected or extraordinary stress related to her employment. The hearing officer further found that the "long-term pre-existing medical history and prior emotional problems associated with the death of her son, together with her misconceptions of the actual facts, negates the relationship between Ms. Renter's depression and the PTSD and her employment at Willis Knighton." Op., 5.
On appeal, plaintiff asserts that the hearing officer erred in relying principally on the expert testimony of a non-treating physician. Second, she asserts that the hearing officer erred in failing to apply a presumption of disability due to the aggravation of a pre-existing condition. Third, she alleges the hearing officer erred in applying a "reasonable person" standard in determining whether the related incident was an "extraordinary stress." Fourth, plaintiff contends the hearing officer erred in requiring clear and convincing evidence to prove a causal connection between plaintiff's injury and the incident.

Applicable Law
Prior to 1989, the Act limited compensable "injuries" to "include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom." La.R.S. 23:1021(7)(a). Louisiana courts interpreted the Act to encompass mental injury only when it occurred secondary to an ascertainable physical injury ("physical/mental" claim) or work-related stress resulted in actual physical injury ("mental/physical" claim). Westley v. Land and Offshore, 523 So.2d 812 (La.1988); Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972).
In 1989 the Supreme Court extended the definition of "injury" to include a mental injury induced by mental stress ("mental/mental" claim) when the mental injury is caused by a significant employment-related event or incident that is readily identifiable, unusual and dramatic, but is not accompanied by any apparent sign of physical trauma. Sparks v. Tulane Medical Center Hosp., 546 So.2d 138 (La.1989); Williams v. Regional Transit Authority, 546 So.2d 150 (La.1989). In response to these decisions the legislature quickly amended the Act to provide in pertinent part:
(b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury or accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence. La.R.S. 1021(7)(b) (enacted by Acts 1989, No. 454).
* * * * * *
(d) No mental injury or illness shall be compensable under either Subparagraph (b) or (c) unless the mental injury or illness is diagnosed by a license psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association. La.R.S. 1021(7)(b), (d) (Enacted by Acts 1989, No. 454).
The Act therefore requires the claimant in a mental/mental claim to prove by clear and convincing evidence that her mental disorder was the result of a "sudden, unexpected and extraordinary stress" related to her employment. Jeansonne v. Wick Publishing Co., 94-462 (La.App. 5th Cir. 11/29/94), 646 So.2d 1212, writ denied 94-2963 (La. 2/3/95), 649 So.2d 405; Cressionnie v. Fisk Electric, 93-931 (La.App. 5 Cir. 2/14/96), 671 So.2d 3. The "clear and convincing" standard required by La.R.S. 23:1021(7)(b) is a heavier burden of proof than the usual civil case "preponderance of the evidence" standard, but is less burdensome than the "beyond a reasonable doubt" standard of a criminal prosecution. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Mitchell v. AT & T, 27,290 (La.App.2d Cir. 8/28/95), 660 So.2d 204, writ denied 95-2474 (La. 12/15/95), 664 So.2d 456.
*608 The appropriate standard for appellate review in workers' compensation cases is the "manifest error-clearly wrong" standard. The same standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of an administrative body or hearing officer. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94), 630 So.2d 706.

Discussion: Sudden, Unexpected, and Extraordinary Stress
By her third assignment, Ms. Renter contends disability from a mental injury caused from work-related mental stress. Various appellate courts have analyzed the requirement of "sudden, unexpected and extraordinary stress." In Jeansonne v. Wick Publishing Co., supra, plaintiff alleged a mental injury from mental stress resulting from being yelled at by her supervisor and from certain, apparently unfounded, accusations. Denying the plaintiff compensation, the court in Jeansonne held that the extraordinary nature of the stress must be determined from the viewpoint of an ordinary reasonable person of usual sensibilities, not from the point of view of the particular claimant. Id. In so holding, the court followed Bryant v. Giani Inv. Co., 626 So.2d 390, (La.App. 4th Cir.1993), writ denied, 94-0089 (La. 3/18/94), 634 So.2d 852.
We agree with the majority rule that the extraordinary nature of the stress must be determined by whether an ordinary reasonable person of usual sensibilities would find the stress "extraordinary." See, Bass v. Farmer & Cheatham, 94,128 (La.App. 1st Cir. 6/30/95), 658 So.2d 324; Bryant, supra; Cressionnie v. Fisk Elec., supra.[3] The 1989 amendments to the Act "reflect an intent by the Legislature to stringently condition the award of workers' compensation benefits for mental injury or illness." Bryant v. Giani Inv. Co., supra. To view a particular stress only from a particular claimant's perspective would be wholly inconsistent with the plain language of § 1021(7)(b) and the legislative intent described in Bryant, supra. From a claimant's perspective, "every stress that actually caused injury would be considered `extraordinary' because no one, from their own personal perspective, would consider to be `ordinary' a stress that caused them mental injury or illness." Bryant, supra. By amending § 1021(7)(b) the legislature distinctly prescribed that mental/mental claims caused by work-related stress which are not "extraordinary" cannot be compensable. See W.S. Malone and A.H. Johnson, III, 13 Louisiana Civil Law Treatise: Workers' Compensation Law and Practice § 235; Bryant, supra.
In the case sub judice, Ms. Renter's claimed extraordinary stress was seeing a patient in the bathtub. She claimed she believed the patient had committed or was attempting suicide. However, contrary to Ms. Renter's belief, the patient was not attempting suicide, but merely relaxing in the bathtub and washing her hair. Nurse Ritchie, an R.N. who was on shift with Ms. Renter at the time, positively testified by deposition that after the incident on September 19th, the patient was calm and required no medical attention; she was actually puzzled by Ms. Renter's reaction. Nurse Ritchie further testified that she continued to work her shift and did not view the incident as an emergency situation or anything out of the ordinary. Also testifying via deposition was Cynthia Joiner, the director of nursing in the Behavioral Medicine Unit at WKMC and Ms. Renter's supervisor. Nurse Joiner testified that Ms. Ritchie called her shortly after the event, indicating that Ms. Renter "had become upset and that she chose to go to the emergency room." Nurse Joiner further stated that Ritchie was not upset and indicated there was no incident other than Ms. Renter became hysterical.
In sum, Ms. Renter failed to prove by clear and convincing evidence that the September *609 19, 1992 incident amounted to sudden, unexpected and extraordinary stress as required by the Act. Though Ms. Renter may have misinterpreted the incident, it was not such a wholly unusual episode that it can fairly be described as "extraordinary." In fact, Ms. Renter even indicated that it was not uncommon for her to see patients in the bathtub. Therefore, we find the hearing officer did not err in concluding that Ms. Renter failed in her burden of proving by clear and convincing evidence that the injury was the result of a sudden, unexpected, and extraordinary stress.

Causation
In light of our determination that Ms. Renter failed to prove a compensable incident under the specific language of § 1021(7)(b), the issue of causation advanced by her other assignments of error is moot. Nevertheless we would find that the hearing officer's conclusion is not plainly wrong.
In addition to proof of an "extraordinary event," Ms. Renter is obligated to prove, by clear and convincing evidence, that the mental stress caused her to suffer the injuries claimed. Jeansonne v. Wick Pub. Co., supra.
First, the evidence did not demonstrate that the 1992 incident alone was the originating event of the PTSD. Although there was conflicting testimony as to whether the 1992 incident caused symptoms of a pre-existing PTSD to recur the record supports the conclusion that the PTSD existed long before the incident in question. The documentary and testimonial evidence traces a history of severe trauma as far back as 1968. At that time, Ms. Renter was hospitalized two months for psychological treatment and indicated she was unable to drink water without vomiting and she was often depressed. From that time on, Ms. Renter experienced various crises for which she was subsequently treated for mental problems.[4] Even prior to the 1992 incident, Ms. Renter was reporting flashbacks, low mood and excessive absenteeism.
Second, even if Ms. Renter proved the WKMC incident caused the emergence of the PTSD symptoms, she failed to prove that the disabling symptoms persisted for the period claimed. Dr. Ware and Dr. Kessel agreed that various day to day events could function as stimuli for the emergence of the PTSD symptoms. Dr. Kessel could not determine whether the recurrence of the symptoms after the WKMC incident was related to that incident or other events unrelated to her work. Dr. Ware testified, however, that the effects of the WKMC incident persisted less than 24 hours. He believed that if the symptoms existed beyond that period, they were triggered anew by other stimuli (i.e. attempting to take a bath or drink water). Given Dr. Ware's expertise and thorough familiarity with the case, we cannot say that his opinion was patently unsound. Therefore, the hearing office would be entitled to accept his opinion over that of another expert. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). Thus, the evidence in this record does not support by clear and convincing evidence that this incident caused the latent PTSD to become symptomatic for the extended period claimed by Ms. Renter as disabling.
Finally, all the experts agreed that an accurate depiction of Ms. Renter's medical and work history was crucial in determining a correct diagnosis. However, Ms. Renter's version of her medical history was contradicted numerous times on cross examination and by other evidence presented at trial. She admitted that she may have lied to her treating physicians and testimony indicated that she often exaggerated symptoms to benefit herself. Additionally, Ms. Renter's account of her own work history was contradicted; documentary evidence showed her work history prior to 1992 was fraught with dissension and excessive absenteeism. Given these facts, the hearing officer was justified in discounting Ms. Renter's contention that this work-related incident caused the PTSD *610 to become symptomatic for the extended period claimed.
Based on the record evidence, the hearing officer was not clearly wrong in concluding that the evidence was insufficient to show by clear and convincing evidence that the 1992 incident caused the injuries claimed by Ms. Renter.

Conclusion
The hearing officer was not clearly wrong in her conclusion that Ms. Renter failed to establish by clear and convincing evidence any of the requirements of La.R.S. 23:1021(7)(b). For the reasons expressed, the judgement of the hearing officer is affirmed. Costs of this appeal are assessed to appellant.
AFFIRMED.
NOTES
[1] Ms. Renter testified that she grabbed the patient, shook her hard, revived her, and with the assistance of another nurse got her back in bed. Nurse Ritchie, however, contradicted this; she testified that alerted by Ms. Renter's screams, she came to the room and found the patient still in the bathtub; and that the patient needed no assistance returning to her bed.
[2] Dr. Kessel's deposition was taken about three weeks before the hearing.
[3] The third circuit, however, has declined to apply the objective "reasonable person" test to claims of this nature, stating rather "the analysis must focus [subjectively] on the effect a particular stress might have on the particular employee." Lewis v. Beauregard Memorial Hospital, 94,318 (La.App. 3 Cir. 11/2/94), 649 So.2d 655, 661 (emphasis added); confer Henry v. Gulf Coast Cas. Ins. Co., 95,241 (La.App. 3 Cir. 1/31/96), 670 So.2d 307, which may indicate a retreat from this position.
[4] We also note there is no evidence in the record that loss of ability to cope with a pre-existing mental injury is itself a compensable injury within the meaning of § 1021(7)(d). See Bass v. Farmer & Cheatham, supra.