| ¡¿DALEY, Judge.
Claimant, Kenneth M. Joseph, appeals a determination by the Office of Workers’ Compensation that denied him benefits for an alleged mental injury caused by extraordinary mental stress related to his employment. Joseph, a Jefferson Parish Fire Department employee, claimed he suffered from post traumatic stress syndrome following the May 8, 1995 flood, when in the course and scope of his employment he was required to drive a fire truck through the flooded streets of Jefferson Parish while responding to rescue calls. Joseph claimed that this event, coupled with many past stressful events as a firefighter, triggered the onset of Post Traumatic Stress Disorder (PTSD).
The trial judge found that Joseph had experienced extraordinary stress while responding to the flood, but that he did not prove his entitlement to benefits. Joseph appeals, asking this |scourt to award him benefits for a mental injury resulting from mental stress. The Jefferson Parish Fire Department answered the appeal, asking this court to reverse the trial court’s factual finding that Joseph experienced extraordinary stress.
Analysis
To prove entitlement to benefits for a mental injury resulting from mental stress (the so-called “mental/mental” injury), a claimant must prove that the mental injury was caused by “sudden, unexpected, and extraordinary stress related to employment” and must prove it by clear and convincing evidence. Renter v. Willis-Knighton Medical Center, 28,589 (La.App. 2 Cir. 8/23/96), 679 So.2d 603; Cressionnie v. Fisk Elec., 93-931 (La.App. 5 Cir. 2/14/96), 671 So.2d 3; Jeansonne v. Wick Publishing Co., 94-462 (La.App. 5 Cir. 11/29/94), 646 So.2d 1212.
LSA R.S. 23:1021(7)(b) and (d) state, pertinently:
(7)(b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.
[[Image here]]
(d) No mental injury or illness shall be compensable under either Subpara-graph (b) or (c) unless the mental injury or illness is diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
Not only must the stress be extraordinary; it must be sudden and unexpected. Favorite v. Louisiana Health Care Authority, 98-721 (La.App. 5 Cir. 12/16/98), 725 So.2d 556; Bass v. Farmer & Cheatham, 94-1281 (La.App. 1 Cir. 6/30/95), 658 So.2d 324. Also, the statute requires that the extraordinary stress cause the mental injury.
14Joseph testified, in deposition and at trial, that he had been employed by the Jefferson Parish Fire Department since August of 1979. At the time of the May 8, 1995 flood, he drove the fire truck, which transported equipment and 4 or 5 men to rescue calls and fires. Joseph said that after the flood he lost interest in his job and had an incredible fear that he was unfit to do his job. He had trouble with attendance and was accused of insubordination during the time period from January to April, 1996.
Mr. Joseph first sought counseling for his condition on April 17, 1996, almost one year after the flood. It was recommended that Joseph see the counselors at Ochsner as part of an employee assistance program in part because of insubordination charges against Joseph stemming from an argu *803 ment he had with Ron Vix, his chief. The notes from plaintiffs visit to Ochsner for counseling on April 17, 1996 record that plaintiff reported work stress that had been worsening for six months (the flood was eleven months prior). He also reported fearing retribution by his superiors for standing up for his co-workers’ rights. It was noted that Joseph smelled strongly of alcohol at this visit, but he became very defensive about it when confronted. He first denied alcohol consumption but then admitted to having two beers prior to the appointment. The notes indicate that he refused a blood alcohol test. The counsel- or opined that he could not return to work that day due to intoxication, and could not properly assess when he could return to work because he refused to talk further about the work stress.
Mr. Joseph first saw Dr. Samuels, his treating psychiatrist, on April 19, 1996. Dr. Samuels, however, was not affiliated with the employee assistance program; Joseph saw him on the recommendation of a friend, because he was not comfortable with the counselor at the assistance program. Mr. Joseph testified that he did not | ^realize he suffered from post traumatic stress disorder or that the flood was the triggering event in his post traumatic stress, until he was evaluated by Dr. Sam-uels. When Joseph first saw Dr. Samuels, insubordination charges were pending against him. Joseph eventually was terminated, and then reinstated, to his position as firefighter, after a civil service proceeding.
Joseph described a firefighter’s job as saving lives and protecting property. Over the course of his employment, Joseph has witnessed, during fires and emergency responses, many injured people and fatalities. He described responding to several fires and car accidents with fatalities, one in which a child died in his arms. He also described the horror of responding to the plane crash in Kenner several years ago. He acknowledged that firefighters are trained to respond to life-threatening emergency situations where injuries and fatalities are possibilities.
Dr. Samuels testified that he first saw Joseph on April 19, 1996, and diagnosed him with post traumatic stress disorder at the first session. Dr. Samuels specializes in stress disorders and operates the Stress Center. Dr. Samuels testified post traumatic stress disorder arises from cumulative exposure to many traumas, but it will have a “triggering” event to become symptomatic. Dr. Samuels testified that the triggering event for Mr. Joseph was the May 8, 1995 flood. On that day, Joseph was assigned to the fire station in Lafreni-ere on the East Bank of Jefferson Parish. Dr. Samuels related that Joseph told him how stressful that night was. The engine responded to calls on a continuous basis, from around 8:00 p.m. to sunup the next morning. Dr. Samuels testified that Joseph’s identity was completely bound up in being a fireman. His ability to perform his job was very important to him, and, during the flood, Joseph was under extreme stress because he was responsible for moving the rig, the safety of it, the equipment, and the men on board. After the flood, Joseph | fiwas afraid that his anxiety would get in the way of being a fireman. Dr. Samuels testified that all firemen are conditioned to reject fear, which is bad because fear is natural. Joseph was not able to discuss his fears with any coworkers. Every time he saw a fire truck it triggered his stress, so he had full blown PTSD by April of 1996.
Dr. Samuels admitted that Joseph did not dwell on the flood in their first interview. Nor did a 4/29/96 report to Joseph’s attorney from Dr. Samuels mention the flood. He agreed that PTSD is the result of a series of cumulative traumas over the entire course of employment, but said that one event consolidates the traumas. Dr. Samuels also agreed that the disciplinary hearings would cause feelings of anxiety and depression.
Dr. Samuels testified that, at the time of trial, Joseph was through the crisis and *804 didn’t need treatment at the current time. However, he was concerned that Joseph’s return to employment at the fire department would risk exposures to new traumas and cause the PTSD symptoms to resurface.
Dr. Roniger, a psychiatrist, examined defendant on behalf of the defense. Dr. Roniger diagnosed Joseph with an adjustment disorder with mixed disturbance of emotions and conduct.
Joseph was also seen by a Dr. Dean, who opined that Joseph did not suffer from PTSD because the flood did not involve a life threat to Joseph, a loved one, or someone else. Joseph admitted that, despite his fears, nothing bad happened to him or his crew that night.
Leonard Healy testified that he was acting captain of Joseph’s station on the night of the flood, and worked with Joseph. The flood stood out in Healy’s mind because it was extreme. They had to respond to calls in 2, 3, and 4 feet of water. As soon as they finished one call, they had to respond to another, except for a brief break 17they were able to take at another station. He noted that all engines were out that night, responding to calls. He said the conditions, not being able to see obstacles, and seeing only the tops of some cars, scared the hell out of him. He testified that during the flood the tempered glass window on the back of the fire truck shattered and that scared all of the men because it sounded like a gunshot. He said that the entire night was stressful, because it was not like going to a fire and then returning; it was constant. He was unaware that Joseph had any problems that night; he just remembers that plaintiff was busy doing his job and did it well.
On cross, Healy said that as a firefighter, on the night of the flood he was doing the job he trained for and is paid for. He said that on every call, there is always a potential that it will be life threatening. Speeding through traffic and traffic lights on “regular” calls is also stressful, because of the risk that the rig might hit a motorist. Healy has responded to terrible fires and automobile accidents before, much like the plaintiff had, although not on the night of the flood. However, the fact that the flood was at night made it more stressful.
Michael Milligan, a fire truck operator for twelve years, testified that he drove a fire truck all night the night of the flood and it was unusually stressful that night. He was not working with the plaintiff that night. He gave examples of calls he has responded to, both on the flood night and other nights, and they were similar to the ones plaintiff experienced. He agreed that on the night of the flood, he was doing what he was trained to do, and that he might have to respond to a flood again.
William Ziegler testified that he was an acting operator on the night of the flood, and that he had to drive a rig although it was not his usual job. His testimony mirrored the other firefighters’, that the night was usually stressful, but he was doing what he was trained to do and might have to do again.
Is Joseph testified that he was unaware of the existence of PTSD until Dr. Samuels told him about it. He said that he was totally unprepared for the situations he had to face on the night of the flood. People know about flooded streets, but very few have to navigate a large vehicle through flooded streets. He had extra stress because of being responsible for the vehicle when he was not the ranking officer on the vehicle. Responding to this flood was not the same as planned readiness for a hurricane, because this flood happened unexpectedly. He testified his involvement in the flood was unexpected and the nature of it was unexpected. Dr. Samuels helped him see that the flood was the focus of all his symptoms.
Chief Edward Goldman also testified. Goldman has been employed with the fire department for 29/é years and is an assistant chief. It was he who suggested that plaintiff seek professional help. He felt that plaintiff needed help getting along in *805 the fire house, and he also felt that plaintiff has had this problem all along, and that he still has it. He felt that plaintiff has always had trouble getting along with people who were in authority over him, and that this problem predates the flood.
Donald Bock, the superintendent for the East Bank Consolidated Fire Department, testified that on May 8, 1995, every fire department in New Orleans, St. Bernard, Kenner, the West Bank, Harahan, and Me-tairie responded to the floods. To his knowledge, no one else had filed a stress claim for this date.
A review of the records of Joseph’s insubordination charges of March 18, 1996 show that Joseph committed three acts of insubordination on March 18, 1996 when he refused and challenged three orders, made directly to him, to wash the fire engine. Another incident on that day stemmed from his refusal to provide his chief with the written address and zone number of an incident to which they responded. A third incident on the same day occurred when Joseph refused his supervisor Mr. Vix’s laorder to report to Station 19 for duty (Vix was moving Joseph for the evening due to the previous incidents). In the fire engine and Station 19 incidents, Joseph insisted on calling Vix’s superior to protest Vix’s requests, and each time was advised to follow Vix’s request and report a grievance afterwards.
On March 24, 1996, Vix requested that Joseph be reassigned to a different platoon, citing Joseph’s “flagrant disregard for procedure, rules and regulations and a predilection for creating discord,” and that these tendencies were exhibited throughout his tenure under Vix’s command.
In a fact finding report of the March 18, 1996 incidents, made on April 4, 1996, the committee noted that Joseph’s infractions “are more of attitude that of deed ... He is, and has been, as effective firefighter and operator.”
On April 16, 1996, one day before he reported to Ochsner, Joseph was informed by the Superintendent of Fire that he was to be suspended for 36 hours, and would receive an oral and a written reprimand for incidents occurring on March 18, 1996. A later report indicates that Joseph was suspended for 48 hours for insolence occurring on April 12 and 15, 1996 (his refusal to sign an inoculation form).

Analysis

In evaluating the testimony, we note several things. First, the flood of May 8 presented extreme working conditions for most metro area firefighters, because they were required to respond to flood-related calls virtually all night on a constant basis. However, all the firefighters who worked with Joseph that night who testified said that none of the actual calls involved life-threatening situations comparable to past calls such as plane crashes, fires, and automobile crashes with fatalities. Every other firefighter who testified said that he was performing the job he was trained to do, and [inthat he anticipated having to respond to such flood situations in the future. Only plaintiff thought that he was not trained to respond to the flood. The firefighters all agreed that it is their job to respond to stressful and life-threatening emergencies, which by their very nature can be sudden and unexpected.
Second, plaintiff did not seek treatment until approximately one year after the flood, and he did not realize the flood was the trigger of his problems until he was told that the flood was the triggering event by Dr. Samuels, who diagnosed him with PTSD after one session. Joseph sought treatment one day after learning of his 36 hour suspension. Dr. Samuels opined that Joseph’s insubordination charges and unexcused absences were manifestations of PTSD, but also said it was just as likely Joseph would have ended up being disciplined for insubordination without suffering PTSD because he has problems with people in authority over him. Dr. Samuel declared Joseph totally disabled, but then *806 released him to return to work as soon as his disciplinary problems were resolved.
The trial judge found in her Reasons for Judgment that, “He (claimant) has not established that the flood was the predominant cause of the mental injury” and that, “The Claimant has failed to demonstrate by clear and convincing evidence that his mental injury was caused by the flood of May 8, 1995.” The trial judge noted that claimant did not seek psychological treatment until almost a year after the flood. It is clear from the record that the trial judge made a credibility call, and she did not believe Joseph’s and Dr. Samuels’s testimony that the flood caused Joseph’s PTSD to become symptomatic. Another fact that supports the trial judge’s credibility determination is plaintiffs claim that his conflict with authority derived from him standing up for his co-workers. The actual incidents of insubordination for which ¡ n t plaintiff was disciplined did not involve plaintiff defending his co-workers, but involved his refusal of orders made directly to him.
The trial court did not err in denying workers’ compensation benefits to Mr. Joseph. Mr. Joseph did not demonstrate by clear and convincing evidence that his mental injury was a result of a sudden unexpected and extraordinary stress related to his employment. First, performing rescues by a fireman in Jefferson Parish during a flood is not an unexpected event. Second, the evidence is not clear and convincing that it was the flood that caused Joseph’s PTSD to become symptomatic. Hence we affirm the trial court’s denial of compensation benefits to Mr. Joseph.
Extraordinary Stress
The Jefferson Parish Fire Department appeals the trial court’s finding that Joseph experienced extraordinary stress, related to his employment, responding to the flood on May 8,1995.
Whether the stress was “sudden, unexpected and extraordinary” is determined from the point of view of whether an ordinary reasonable person of usual sensibilities would find the stress extraordinary, not whether the particular claimant found the stress to be extraordinary. Aucoin v. Dow Chemical Co., 98-1912 (La.App. 1 Cir. 9/24/99), 745 So.2d 682; Bass v. Farmer & Cheatham, supra; Renter v. Willis-Knighton Medical Center, supra; Jeansonne v. Wick Publishing Company, supra.
Viewing the event from the position of the reasonable, objective fireman performing his duties, the record supports a finding that the stress that night was extraordinary. Every fireman witness who testified about his experiences responding to that flood characterized it as extraordinarily stressful for a number of factors. | ^However, responding to emergencies itself is not a sudden or unexpected event in a fireman’s employment, and neither is the fact that he might have to respond to floods. Plaintiffs failure in his burden of proof lies because he failed to prove, by clear and convincing evidence, that the flood was the triggering event in his manifestation of PTSD.
Accordingly, we affirm the finding that the May 8, 1995 flood produced extraordinary stress for Mr. Joseph. However, plaintiff failed to prove that his mental injury was caused by the stress induced by the flood.
AFFIRMED.