660 So.2d 204 (1995)
Willie Faye MITCHELL, Plaintiff-Appellee,
v.
AT & T, Defendant-Appellant.
No. 27,290-CA.
Court of Appeal of Louisiana, Second Circuit.
August 28, 1995.
Rehearing Denied September 21, 1995.
*206 Blanchard, Walker, O'Quinn & Roberts by Robert W. Johnson, Shreveport, for appellant.
James E. Franklin, Jr., Shreveport, for appellee.
Before NORRIS and HIGHTOWER, JJ., and PRICE, J. Pro Tem.
NORRIS, Judge.
The employer, AT & T, appeals a judgment of the Office of Workers Compensation which declared the claimant, Willie Faye Mitchell, temporarily, totally disabled, and awarded weekly benefits; awarded additional medical expenses; and assessed penalties and attorney fees. By four assignments of error, AT & T urges that Ms. Mitchell did not meet the clear and convincing burden of proof now required for temporary, total disability, that AT & T's handling of the claim was not arbitrary and capricious, and alternatively that AT & T is entitled to credit for sick pay and disability retirement paid to Ms. Mitchell. For the reasons expressed, we reverse the award of disability benefits, amend by reducing the award of attorney fees, and render.

Factual background
Ms. Mitchell was employed as a Senior Operator Level 2, Warehouse at AT & T's Shreveport plant at the time of the accident in March 1992.[1] She earned $11.44 an hour. Her job was to receive merchandise that arrived at the warehouse. She generally entered information on a computer while another operator physically placed the merchandise with a fork lift. On March 8, 1992, Ms. Mitchell drove the fork lift and accidentally caught her right heel between a metal beam and the side of the fork lift. She was immediately taken to Willis-Knighton South where she received 22 sutures and was released to the care of Drs. Lewis Jones and James Lillich at Orthopedic Specialists of Louisiana. Although she described immediate pain and numbness upon impact, Dr. Jones diagnosed only a laceration of the heel with sprain of lateral and collateral ligaments of the right ankle, and in the ensuing weeks they noted what appeared to be normal healing. Ms. Mitchell, however, continued to complain of severe pain in her heel. Dr. Lillich nevertheless recommended in late May that she return to sedentary work.
Around this time AT & T also referred her to Dr. James Hill, a family practitioner under contract with AT & T and Willis-Knighton. Dr. Hill examined her by palpating or touching the injured area. When it was apparent that he was about to touch the injured area, she demonstrated excruciating pain. Curiously, when he distracted her to another location and secretly palpated the injured site as well, her reaction was not nearly so great. Dr. Hill obtained these results twice in April and May 1992.
Based on the information from Drs. Jones, Lillich and Hill, AT & T asked Ms. Mitchell to return to a modified form of her job in late May. Because she complained she still could *207 not place any weight on her right heel, the company accommodated her by bringing a wheelchair to her car and permitting her to use it at her computer. Although she was apparently not required to walk at all, she still complained that the pain in her foot was too great for her to work. She spent most of two four-hour shifts in AT & T's medical area, and has not returned to the plant since May 28.
After this, Ms. Mitchell's complaints continued; in fact, in a late June office visit Dr. Lillich found her so emotional and crying that he recommended psychiatric evaluation. In early July, Ms. Mitchell discovered a lump in her right breast; she had undergone surgery for breast cancer about five years earlier, and now underwent about two months of testing and treatment, ultimately finding the recent lump to be a benign cyst. While she was at Schumpert Medical Center in July, Dr. Edward Anglin, an orthopedist, suggested surgery to block the sympathetic nerves affecting her right foot, but she declined this treatment until her breast problem was resolved.
While undergoing breast treatment, however, she began seeing Dr. Shahidul Islam, a pain specialist, for her continued foot pain. He diagnosed post traumatic stress disorder secondary to her work-related injury, with chronic foot pain and pain disorder. Although Dr. Islam was not called to testify, his office reports show that he felt her symptoms were characteristic of sympathetically maintained pain. Because of her physical and psychological condition, he felt she was unable to work and should be considered disabled.
Also around this time, Ms. Mitchell had a bone scan at Willis-Knighton, which revealed an "increased uptake in both feet, compatible with clinical history of trauma" (emphasis added), but otherwise nothing abnormal. Dr. David Adams, an electromyographist, tested her in September and found "no electrodiagnostic evidence of neuropathy, myopathy, peroneal neuropathy, or tarsal tunnel syndrome" in her right foot.
In August 1992, after the breast problems were resolved, AT & T referred Ms. Mitchell to Dr. William Osborne, a specialist in occupational medicine, physical impairment and pain study. His staff at the Impairment and Disability Center conducted a battery of tests. He concluded that the injury left Ms. Mitchell with an 11% impairment of her right foot and a 4% whole body impairment, both permanent. He testified that she can perform "most any job sitting," and if she must stand or walk, it could not exceed 30 minutes to one hour, with 10 to 15 minutes of rest before standing or walking again. While he acknowledged that she has a "valid pain input" because of the injury, he cited psychological test results (MMPI, Millon Multi-axial, and others, administered by Dr. Thomas Staats) showing that she had a pre-existing personality disorder involving "gross psychological symptom magnification," and concluded that she could return to work under the restrictions.[2] He also testified that on the basis of an acetone test and measurements of her thighs and calves, Ms. Mitchell was not suffering from reflex sympathetic dystrophy[3] or muscle wasting.
The following month Ms. Mitchell went to Dr. Glenn Sholte Jr., an anesthesiologist who specializes in pain management, on referral from her breast doctor. He gave her a sympathetic block with local anesthesia, which yielded about 80% relief for 30 minutes or so. Later, in January 1993, he gave her a series of lumbar sympathetic nerve blocks, which decreased her pain and raised her skin temperature, but also were of short duration. He testified by deposition that trauma can cause sympathetic dystrophy, and he believed that Ms. Mitchell's was caused that way. He accepted her complaints of constant, sharp, needle-like pain, and said he did not believe she could engage in her old job at *208 AT & T. He stated, however, that he thought her job involved assembling telephone components on an assembly line. R.p. 374. He expressed no opinion as to whether she could work within the restrictions outlined by Dr. Osborne. He concluded that she had not reached maximum medical improvement, and felt that her only options for relief were either a sympathectomy (surgical removal of the sympathetic nerves), or implanting an epidural catheter (to administer pain-killing drugs at regular intervals). He recommended the epidural.
Ms. Mitchell's treating physician, Dr. Lillich, reported in October 1992 that there was "nothing more" he could do for this patient. While expressing the opinion that she could return to light duty work, he also felt that her severe pain and psychological problems would prevent her from doing so. He added that these problems would be best addressed by a psychiatrist, and reiterated, "I feel that she could have * * * perform[ed] that type of work."
Ms. Mitchell testified that on the date of the hearing, in September 1993, her foot was still swollen, in constant pain and occasionally numb. She doubted she could do any kind of work, as she claimed she could stand flatfooted only a minute or so, and is also very uncomfortable sitting down. She admitted, however, that despite the pain she drives regularly and does her own shopping for groceries and clothes. She also explained that she was unable to work not because her ankle was stiff, but simply because the pain was severe. R.p. 101.
Immediately after her accident in March 1992, AT & T (a self-insured employer) began paying her accident disability benefits of $457.60 per week, including $295 as required under the workers comp statute. In September 1992, on the strength of the reports from Drs. Jones, Lillich and Hill, AT & T determined that Ms. Mitchell's absence from work was no longer related to the accident but to another sickness; the company therefore converted her to sickness disability. This in effect terminated comp payments for the job-related injury.[4] She was eligible to receive sickness disability for 52 weeks at $457.60 per week after which, in September 1993, if she was still unable to work, she would be automatically converted to disability retirement at $840.70 per month for the rest of her life. At the time of the hearing, she had drawn $12,538.24 in accident disability and $24,252.80 in sickness disability. AT & T had paid all the medical expenses for Drs. Jones, Lillich, Hill, Anglin and Osborne, and the first few visits with Drs. Sholte and Islam. However, as early as June 1992, AT & T's adjuster declined to pay for open-end treatment proposed by Dr. Islam, and in March 1993 it also refused to pay for the epidural proposed by Dr. Sholte.
Ms. Mitchell filed this claim with the Office of Workers Compensation in March 1993, urging she had not reached maximum medical improvement and was still unable to work, and claiming supplemental earnings benefits. She also claimed as necessary medicals the epidural proposed by Dr. Sholte, as well as continued treatment with both Dr. Sholte and Dr. Islam. By pretrial statement Ms. Mitchell claimed penalties and attorney fees. AT & T also claimed credit for sick pay and disability retirement paid to Ms. Mitchell.

Action of the hearing officer
By judgment of July 1994 the hearing officer found that Ms. Mitchell sustained a crushing injury to her right heel while in the course and scope of her employment with AT & T.[5] She found Ms. Mitchell's testimony credible and consistent, "particularly with regard to her substantial pain and inability to work." She also found that Ms. Mitchell had not reached maximum medical improvement. She therefore found that Ms. Mitchell was *209 entitled to benefits for temporary, total disability from the date that AT & T had terminated them. The hearing officer also observed that the company's efforts at rehabilitation were "woefully inadequate in view of what the statute contemplates." Finally, citing the totality of the evidence, the hearing officer found that AT & T's actions in terminating Ms. Mitchell's benefits and refusing to authorize the treatment proposed by Dr. Sholte was arbitrary, capricious and without probable cause. The hearing officer therefore ordered reinstatement of temporary, total benefits from the date of termination until Ms. Mitchell reaches maximum medical improvement; medical expenses for past and future treatment by Dr. Sholte; statutory penalties; and attorney fees of $8,500.

Applicable law
Benefits for temporary, total disability are regulated by La.R.S. 23:1221(1), which provides in pertinent part:
(1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee at the time of the injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability. * * *
(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment * * *, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required, or six months after the injury, whichever first occurs. * * * (emphasis added)
The provisions of § 1221(1)(c) requiring proof by clear and convincing evidence and excluding benefits for claimants who would work in pain were enacted in 1989 and apply to compensable injuries occurring after January 1, 1990. La.Acts 1989, No. 454, §§ 6, 13; Tanner v. International Maintenance Corp., 602 So.2d 1133 (La.App. 1st Cir.1992). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Louisiana State Bar Ass'n v. Edwins, 329 So.2d 437 (La.1976); Green v. Con Agra Broiler Co., 26,599 (La. App. 2d Cir. 3/1/95), 651 So.2d 335.
For injuries that do not result in total disability, but rather leave the employee unable to earn 90% of her pre-injury wage, the statute authorizes Supplemental Earnings Benefits ("SEB"):
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at the time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at the time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience[.] * * *

*210 (c)(i) * * * [I]f the employee is not engaged in any employment or self-employment * * *, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment * * * which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or the employer's reasonable geographic region.
(ii) [I]f the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
Under this subsection, the claimant's substantial pain is a factor, unlike in cases of TTD. Paul v. Gipson, 614 So.2d 1275 (La. App. 2d Cir.1993); Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2d Cir.1991).
The statute imposes penalties of 12% upon any employer or insurer who fails to pay comp benefits unless the employee's right to benefits has been "reasonably controverted by the employer or his insurer." La.R.S. 23:1201E. Section 1201.2 further imposes "all reasonable attorney fees" on any employer or insurer who fails to pay within 60 days of receipt of written notice, "when such failure is found to be arbitrary, capricious, or without probable cause." Whether the termination of benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965); Green v. Con Agra, supra. When the decision is based on competent medical evidence, the termination of benefits will not be found arbitrary, capricious or without probable cause. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982); Green v. Con Agra, supra.
The hearing officer's factual findings are subject to the manifest error rule. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94), 630 So.2d 706. Under this rule, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. Stobart v. State, Through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). Reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La. 1989). The manifest error rule does not insulate a hearing officer's findings when these are based on an incorrect analysis of the statute. Green v. Con Agra, supra at fn 3.

Discussion: Disability
By its first two assignments AT & T contests the hearing officer's award of temporary, total disability ("TTD") benefits. Specifically, AT & T argues that after a lapse of six months, Ms. Mitchell was no longer entitled to TTD benefits under R.S. 23:1221(1)(d), and that she failed to prove by clear and convincing evidence, unaided by any presumption of disability, that she was physically unable to engage in any employment whatsoever, R.S. 23:1221(1)(c). AT & T relies on the expert medical evidence of Drs. Osborne and Hill that Ms. Mitchell does not have any biomedical reason why she cannot work, and that her problems are primarily psychological. AT & T also argues that despite his recommendation of further surgical procedures for Ms. Mitchell, Dr. Sholte never said she could not work under the restrictions set forth by Dr. Osborne and in fact admitted that her fitness to work was beyond his expertise.
Ms. Mitchell counters that Drs. Hills and Osborne only evaluated her, without treating her, and that their opinions should be discounted accordingly.[6] She cites various reports *211 from Drs. Jones and Lillich advising her not to work, as well as Dr. Islam's report that because of her "physical and psychological condition" she is unable to work. She relies very heavily on Dr. Sholte's finding of sympathetic dystrophy, and AT & T's refusal to pay for his proposed treatment. All of this, she urges, is sufficient to support the hearing officer's findings as not manifestly erroneous. Rosell v. ESCO, supra.
The hearing officer did not enunciate the standard for finding TTD under R.S. 23:1221(1). In support of the finding of TTD, however, she made two factual findings. First, she found that Ms. Mitchell's testimony of "substantial pain and inability to work" was credible and consistent. The statute, however, excludes "working in any pain" as a ground for which TTD may be awarded. Sec. 1221(1)(c); Malone & Johnson, Workers' Compensation (13 La.Civ.Law Treatise), § 275. The hearing officer, therefore, was plainly wrong to apply this standard to the finding of TTD.
The hearing officer's second finding was that Ms. Mitchell had not yet reached maximum medical improvement. Since the 1989 amendment to § 1221(1)(d)11, however, maximum medical improvement has not been the standard for the termination of TTD benefits. Graham v. Georgia-Pacific Corp., 26,165 (La.App. 2d Cir. 9/23/94), 643 So.2d 352, fn. 2. The hearing officer was plainly wrong to cite and rely upon this. Rather, TTD benefits cease when the physical condition of the employee has resolved itself to the point that a "reasonably reliable determination of the extent of disability" may be made and "continued, regular treatment by a physician is not required," or six months after the injury, whichever occurs first.
Without the findings that Ms. Mitchell would be working in pain and has not reached maximum medical improvement, we have reviewed the evidence to see if it will support the award of TTD benefits. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993). Under the proper standard, the claimant must prove by clear and convincing evidence, unaided by any presumption of disability, that she is physically unable to engage in any employment or self-employment, regardless of the nature of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in pain, regardless of the location or availability of such employment or self-employment. The claimant's testimony that she does not think she could perform her old employment is obviously inadequate to meet the burden of proof. Green v. Con Agra, supra.
The evidence in support of the judgment includes Ms. Mitchell's own testimony, such as the admission that pain alone was preventing her from returning to work. This, of course, does not satisfy the statute. Green v. Con Agra, supra. Moreover, working in pain does not entitle the claimant to TTD benefits. Ms. Mitchell's treating physicians, Drs. Jones and Lillich, both reported at various times that she should not be working; however, their October 1992 letter proves they attributed her inability to work to pain and pre-existing psychological problems, and felt she was functionally able to work. Two other doctors, Drs. Islam and Sholte, reported that she could not work. Of these, Dr. Sholte was more expansive; however, he specifically deferred to "someone who does functional capacity evaluations," and he was misinformed as to the nature of Ms. Mitchell's work. R. pp. 387, 374. These admissions of necessity affect the proper weight to be assigned to his opinion. Dr. Sholte also recommended a surgical procedure which would hopefully alleviate her pain, but this does not appear to be "continued, regular treatment" as envisioned by the statute. Dr. Islam did not testify, but his office notes and letters to the Office of Disability Determinations indicate he considered her unable to work "because of [her] physical and psychological condition" (emphasis added). Like Dr. Sholte's testimony, this evidence corroborates that Ms. Mitchell is in some pain, but that finding does not justify an award of TTD benefits. Further, there is no indication in Dr. Islam's records that he was familiar with the demands of Ms. Mitchell's work or the restrictions imposed by Dr. Osborne.
*212 On the other side, the original treating physicians, Drs. Jones and Lillich, recommended in May 1992 that she attempt sedentary work; by October, however, they indicated that other problems were keeping her from working. Since the "other problems" apparently include recurrent lumps in the breast, the impact of this influence is easy to imagine. Dr. Osborne, who performed a thorough battery of tests, quantified her permanent disability and released her to work under certain restrictions. This meets the statutory requirement of a "reasonably reliable determination of the extent of disability." Dr. Hill also reported that she could work within restrictions. Ex. D-1-B. Finally, to some extent Ms. Mitchell's credibility was affected by Dr. Hill's distraction test results and the psychological findings of symptom magnification.
On this record, we are constrained to hold that Ms. Mitchell has not shown by clear and convincing evidence, or made it highly probable, that she is physically unable to engage in any employment or self-employment, including working in pain. Her own testimony shows that the only impediment to her working is pain, and the medical evidence from every expert who was familiar with the demands of her work established that she could indeed perform her old job within certain restrictions. Because the statute requires us to disregard her complaints of pain and her failure to reach maximum medical improvement, we have no alternative but to disqualify Ms. Mitchell from TTD benefits on the evidence presented. The judgment will be reversed.
On the instant record we are also unable to find that Ms. Mitchell is entitled to the alternative remedy of SEB. While substantial pain is a basis for SEB, and there is some evidence in support, this record is replete with psychological findings that cast serious doubt on the gravity of her subjective complaints. In the balance, we cannot conclude that her testimony and the expert evidence clearly and convincingly prove that Ms. Mitchell is unable to work solely as a consequence of substantial pain. R.S. 23:1221(3)(c)(ii).
For these reasons the judgment awarding disability benefits is reversed. Because of this conclusion, we pretermit the issue of reduction or credit advanced in AT & T's supplemental brief.

Penalties and attorney fees
By its fourth assignment AT & T urges the hearing officer erred in finding that its conduct in discontinuing Ms. Mitchell's benefits was arbitrary, capricious and without probable cause. It argues that several physicians cleared her to return to light-duty work, which the employer strove to provide. It further submits that the decision to terminate Ms. Mitchell's TTD benefits was prudent and reasonable. Ms. Mitchell argues that AT & T actually relied exclusively on Dr. Osborne's report, which she contends was not worthy of belief. She also urges the company disregarded the diagnosis of reflex sympathetic dystrophy from Drs. Sholte and Anglin, and the reports of disabling pain from Drs. Lillich and Islam.
AT & T's benefits specialist, Jim Crews, testified that in converting Ms. Mitchell from workers comp to sickness disability, he considered reports from Drs. Lillich (quoted above), Sholte (who diagnosed sympathetically maintained pain but whose nerve blocks had been postponed by Ms. Mitchell) and Osborne (whose report, including the psychological profile from Dr. Staats, was quoted extensively). While Ms. Mitchell has deprecated Dr. Osborne's findings, we find that his series of tests was comprehensive and apparently objective. This is competent medical evidence. Martin v. H.B. Zachry Co., supra. We also note that Dr. Lillich's letter was somewhat equivocal as to Ms. Mitchell's condition, and Dr. Sholte's, though declaring her unable to work, showed no familiarity with her job and did not consider the restrictions set by Dr. Osborne. Faced with some evidence that Ms. Mitchell could work, some that she could not because of pain, and psychological test results indicating that she tended to magnify symptoms, AT & T was entitled to terminate benefits. Spurrell v. Ivey, 25,359 (La.App. 2d Cir. 1/25/94), 630 So.2d 1378. On the evidence available at the time, AT & T was not arbitrary, capricious or *213 without probable cause to discontinue Ms. Mitchell's TTD benefits. The hearing officer was plainly wrong to hold otherwise.
In one respect, however, the hearing officer was not plainly wrong. Dr. Sholte recommended an epidural to relieve Ms. Mitchell's persistent pain. Dr. Osborne did not agree with his diagnosis of reflex sympathetic dystrophy, but he did not deny that the procedure would be useful. The hearing officer found it a necessary medical expense under R.S. 23:1203A, and this conclusion is not manifestly erroneous. At any rate, AT & T has not seriously contested it. In light of the absence of evidence to contradict Ms. Mitchell's showing that the epidural qualified under § 1203A, the hearing officer was entitled to find in this regard only that AT & T's refusal to pay was arbitrary, capricious and without probable cause. A reasonable attorney fee of $2,000 will be assessed; the remainder of the attorney fee award is reversed.

Conclusion
For the reasons expressed, the judgment is reversed insofar as it finds Ms. Mitchell entitled to any disability benefits. The judgment is also amended to set attorney fees for the denial of necessary medical expenses at $2,000. Trial and appellate costs are assessed to Mr. Mitchell.
REVERSED IN PART; AMENDED IN PART AND RENDERED.

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, HIGHTOWER and STEWART, JJ., and PRICE, J. Pro Tem.
Rehearing denied.
NOTES
[1] She had started on the assembly line and advanced to management but had been reclassified as an operator in 1985 because of a layoff.
[2] Dr. Hill, the family practitioner, also reported in December 1992 and May 1993 that Ms. Mitchell's only problem is psychological. See Exhibits D-1-A, D-1-B.
[3] Dr. Hill defined reflex sympathetic dystrophy as "a condition which complicates healing often in extremities, including * * * feet and hands, in which the process of healing is limited by vasopathic reactions of the peripheral arterials in the foot based on overdrive from the sympathetic nervous system." R. p. 138.
[4] Ms. Mitchell received a notice to this effect from the Office of Workers Compensation (LDOL Form 1003) in December 1992. Ex. P-9.
[5] The correct standard is actually personal injury by accident "arising out of and in the course of his employment[.]" La.R.S. 23:1031A. The tort concept of "course and scope of employment," which imposes vicarious liability under La.C.C. art. 2320, is closely related but should not be confused with the statutory comp standard. Malone & Johnson, Workers' Compensation (13 La. Civ.Law Treatise), § 144, fn. 1; but see Craig v. Fournet, 457 So.2d 760 (La.App. 1st Cir.1984).
[6] Ms. Mitchell erroneously states in brief that Dr. Osborne "did not look at her foot." Br. 11. Dr. Osborne specifically called that statement incorrect. R. p. 219. Dr. Osborne admitted, however, that he mostly reviewed the clinical findings of his staff. The medical record shows that Dr. J.R. Bruner of the Impairment and Disability Center performed a thorough physical exam of Ms. Mitchell's foot. Ex. D-2, pp. 108-111.