JjPEATROSS, J.
In this workers’ compensation case, Defendants, Sawyer Industrial Plastics, Inc. (“Sawyer Industrial”) and its insurer, Aet-na Casualty & Surety Company, appeal a judgment in favor of Claimant, Jack M. Edwards, finding Claimant permanently and totally disabled and awarding him workers’ compensation benefits for injuries he sustained while employed by Sawyer Industrial. Defendants also appeal the workers’ compensation judge’s (“WCJ”) assessment of penalties and attorney fees and her failure to give Defendants a credit for unemployment benefits received by Claimant. For the following reasons, we reverse the judgment of the WCJ.
FACTS AND PROCEDURAL HISTORY
Claimant was employed by Sawyer Industrial from February 4, 1990, until August 27, 1991, when he was fired for fighting with a co-worker. Following his termination, Claimant received unemployment benefits for 52 weeks. On September 20, 1992, Claimant brought a workers’ compensation claim against Defendants, alleging that he was permanently and totally disabled as a result of exposure to chemicals while employed at Sawyer Industrial.
According to Claimant, his job duties at Sawyer Industrial included performing lay-ups and working as a mixer.[1] Claimant testified that there were no ventilation *858 fans or windows in the mixing room where he mixed graphite with other chemicals. He also testified that he was provided with a cotton, filter-type dust mask. Claimant testified that he was not given a safety mask or breathing apparatus for protection from chemical vapors while working as a mixer. He also stated that he was not given a material safety data sheet (“MSDS”), and no sheets Lwere posted in areas where employees could see them. According to Claimant, he was not aware that any such protective devices were available to employees. Claimant testified that Jack Sawyer, Sr., the owner of Sawyer Industrial, assured the employees that none of the chemicals would physically harm them.
Claimant complained of several symptoms that he alleges resulted from exposure to chemicals while employed at Sawyer Industrial. He testified that on occasion, during lay-ups, some of the chemicals splashed into his eyes. He also testified that he experienced headaches, dizziness, burning and watering eyes, ringing in the ears, shortness of breath, nausea, vomiting, imbalance and diarrhea with blood in the stool. Claimant testified that he did not see a doctor for these symptoms until after he was terminated.[2] According to Claimant, he had never worked with chemicals during any previous employment; and, prior to working at Sawyer Industrial, he had not suffered from any of the symptoms. Claimant alleges that he had never suffered from asthma, but he admitted that he had smoked an average of six cigarettes a day while employed at Sawyer Industrial.
On September 18, 1991, Claimant consulted Dr. Warren Daniel, a family practitioner, complaining of shortness of breath and chest pains. Claimant attributed these symptoms to his employment. Dr. Daniel found that Claimant suffered from a post-nasal drainage sinus infection, a slightly elevated blood pressure and moderate obesity. His chest x-ray was clear. Dr. Daniel felt that Claimant was very minimally disabled and that he possibly would require a few days off from work to recover. Dr. Daniel concluded that he could not definitely state that Claimant’s illness was directly related to his work environment.
laOn October 3, 1991, Claimant underwent a paranasal sinus examination and was diagnosed with moderate mucosal thickening of the left maxillary sinus. In a medical report dated October 9, 1991, Dr. Lee Joyner diagnosed Claimant with acute bronchitis and noted that “it was very difficult to make a case for any industrial injury.” On February 28, 1992, Claimant was treated at the outpatient clinic at E.A. Conway Hospital in Monroe, Louisiana, where he was diagnosed as suffering from an interstitial pulmonary disorder. On March 3, 1992, Claimant was examined by Dr. Robert Holladay. Based on Claimant’s size and his history of difficulty sleeping and heavy snoring, Dr. Holladay concluded that Claimant probably had some obstructive sleep apnea. On March 12, 1992, Dr. Robert Sarma of the LSU Medical Center examined Claimant and concluded that he had acute bronchitis. On April 1, 1993, Claimant again visited the LSU Medical Center in Shreveport where he was diagnosed with dyspnea related to obesity. He was advised that he should lose 100 to 150 pounds.[3]
Claimant was examined by Dr. Thomas Callender, a board certified physician in internal, occupational, environmental and forensic medicine, in February 1994 and again in April 1995. Dr. Callender testi- *859 fled that about 80 percent of his practice involves patients who have been exposed to toxins. He stated that, although some of the mechanisms are known, the exact manner in which some toxins cause damage to the brain is unknown because it is difficult to conduct that kind of research on humans. Dr. Callender diagnosed Claimant with toxic encephalopathy, a diffuse dysfunction of the brain secondary to some type of toxic exposure. According to Dr. Callender, the symptoms of toxic encephalopathy include depression, fatigue, anxiety, sleep disturbances, sexual dysfunction, memory loss, changes in personality, irritability, mental confusion |4and disorientation. Dr. Callender testified that actual damage to the brain varies with each individual. According to Dr. Callen-der, on a scale of one to ten, Claimant’s toxic encephalopathy rates about a four or five. Dr. Callender also diagnosed Claimant with chronic nasal sinusitis, sleep apnea and peripheral polyneuropathy. Dr. Callender concluded that Claimant was totally and permanently disabled; and, even if Claimant’s sinus and bronchial problems were successfully treated, he would still be totally disabled. Dr. Callender then opined that Claimant’s condition should not prevent him from working a sedentary job; but, for safety purposes, Claimant could not perform a lot of physical activities.
Dr. Narendra Kutnikar examined Claimant on July 5, 1995, and concluded that he suffered from hypertension, morbid obesity and unexplained symptoms of nausea, vomiting and diarrhea. Claimant’s chest x-ray revealed a normal heart size and clear lungs.
On December 2, 1996, Claimant was examined by Dr. Douglas Swift, an expert in occupational medicine. Dr. Swift concluded that Claimant’s lungs were normal, there was swelling in his legs, his heel-to-toe walking was slightly unsteady, his finger to nose pointing was within normal limits and his bowel sounds were normal. Dr. Swift also noted that Claimant was significantly overweight. Although Dr. Swift recommended that Claimant lose weight, he felt that Claimant had a normal exercise capacity. Dr. Swift stated that he did not believe Claimant’s complaints were related to exposure to styrene. He did, however, conclude that a psychiatric evaluation was necessary to determine whether Claimant was truly impaired.
On December 3, 1996, Claimant was examined by Dr. William Emory, a board certified physician in internal medicine, pulmonary medicine and critical-care medicine. Dr. Swift requested that Dr. Emory examine Claimant to determine whether Claimant had any evidence of lung disease. Dr. Emory |sconcluded that Claimant’s lungs were normal and that there was no indication of prior lung injury. Dr. Emory attributed Claimant’s below-normal total lung capacity to his weight.
As a result of a joint request from both parties, Dr. Ronald Goebel, a licensed neu-ropsychologist, interviewed Claimant on February 25, 1997. After the interview, Dr. Goebel directed further testing which took place on March 3 — 4, 1997. Dr. Goe-bel concluded that Claimant probably had a mild degree of organic brain impairment. He opined that the dysfunction was primarily in the right cerebral hemisphere and, therefore, did not appear to be readily attributable to the effects of chronic exposure to chemicals or dust. Dr. Goebel stated that his opinion was based on literature and his experience with other patients who had suffered brain damage. Dr. Goe-bel felt that the types of chemicals to which Claimant was exposed have a different signature pattern.
Dr. Goebel testified that Claimant’s emotional status is abnormal. He noted a large difference between Claimant’s verbal I.Q. and performance I.Q. which could signal lateralized brain impairment. Dr. Goe-bel concluded that Claimant was not disabled from a cognitive standpoint, but his psychological limitations disabled him from working. He opined that, until Claimant achieves significant improvement from a *860 psychological standpoint, Claimant appeared totally disabled. According to Dr. Goebel, this disability could stem from the fact that Claimant believed he had been harmed physically. Dr. Goebel recommended that Claimant receive an evaluation from a psychiatrist to determine the cause of his condition. Claimant did not see a psychiatrist.
Dr. Thomas R. Irvin, an expert in the field of toxicology, testified that when a person is exposed to styrene, there are adverse effects on the neurological system. He also testified that styrene has both primary and secondary effects on other organs and tissue. Dr. Irvin testified that the parts of the brain exposed to | ^styrene cannot completely repair the damage. He also testified that there is a significant amount of literature which demonstrates with some consistency that styrene induced neurological damage can be persistent over a long period of time. Dr. Irvin agreed that one would expect diffuse damage to the brain from prolonged styrene exposure. He also explained that different regions of the brain may be damaged in different ways and that some damage may be repaired at different rates. According to Dr. Irvin, these premises explain why one might see localization of certain damage when testing someone for styrene poisoning. Finally, Dr. Irvin explained that because of the varying effects of styrene on different cells throughout the brain and the varying rate of repair of different damaged regions of the brain, one may only see localized damage, depending on the tests that are conducted.
At the conclusion of the trial, the WCJ found that Claimant suffered from an occupational disease and, as a result, that he was permanently and totally disabled. The WCJ ordered Defendants to pay Claimant permanent and total disability benefits in the amount of $206.67 per week, beginning on August 21, 1991, all medical bills incurred by Claimant as they relate to his work-related injuries and legal interest on all indemnity and medical benefits from the date each became due until paid. She also ordered Defendants to pay $2,000 for their arbitrary failure to pay medicals, an additional penalty of $2,000 for their arbitrary failure to pay disability benefits and $20,000 in attorney fees. Defendants appeal the judgment of the WCJ.
DISCUSSION

Assignments of Error Nos. 1 & 2: Standard of Proof and Permanent and Total Disability

By their first two assignments of error, Defendants contend the WCJ erred in applying an improper standard of proof in finding Claimant permanently and 17totally disabled. Defendants argue that since the WCJ applied the “preponderance of the evidence” standard, as opposed to the “clear and convincing evidence” standard, this court should review this case de novo.
A claimant in a workers’ compensation action has the burden of proving, by a preponderance of the evidence, that a work-related accident either caused or contributed to his disability. Bruno v. Harbert Int’l, Inc., 593 So.2d 357 (La.1992); Balsamo v. Jones, 28,885 (La.App.2d Cir.12/11/96) 685 So.2d 1140; LeBlanc v. Cajun Painting, Inc., 94-1609 (La.App. 1st Cir.4/7/95), 654 So.2d 800. A claimant asserting an occupational disease must prove by a preponderance of the evidence that he suffers a disability which is related to the employment-related disease, that he contracted the disease during the course of his employment and that the disease is a result of the work performed. La. R.S. 23:1031.1(A); Hymes v. Monroe Mack Sales, 28,768 (La.App.2d Cir.10/30/96), 682 So.2d 871. Simply stated, the employee has the burden of establishing his disability and its causal relation with the employment by a preponderance of the evidence.[4] *861 Brown v. Manville Forest Products Corp., 565 So.2d 496 (La.App. 2d Cir.1990). In order for the employee to recover, it must be determined that the employment somehow caused or contributed to the disability, but it is not necessary that the exact cause be found.
A claimant, however, must prove by clear and convincing evidence that he is permanently and totally disabled. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Knotts v. Snelling Temporaries, 27,773 (La.App.2d Cir.12/6/95), 665 So.2d 657. The clear and lsconvincing evidence standard is a heavier burden of proof than the usual civil preponderance of the evidence standard but less burdensome than the beyond a reasonable doubt standard of criminal law. Renter v. Willis-Knighton Medical Center, 28,589 (La.App.2d Cir.8/23/96), 679 So.2d 603; Mitchell v. AT & T, 27,290 (La.App.2d Cir.8/28/95), 660 So.2d 204, writ denied 95-2474 (La.12/15/95), 664 So.2d 456.
After hearing evidence presented by both parties, the WCJ found that Claimant was totally and permanently disabled as a result of his work-place environment at Sawyer Industrial. In reaching this conclusion, the WCJ made the following findings:
I haven’t seen any expert testimony that says the symptoms are inconsistent with toxic exposure. The medical and toxicological evidence more than preponderates that the plaintiff is suffering severe psychological and physiological deficits as a result of his work-place environment at Sawyer Industrial Plastics. And I do find that he is totally and permanently disabled as a result of that.
It is well-settled that in workers’ compensation cases, the appropriate standard of review to be applied by appellate courts is the manifest error-clearly wrong standard. Ultimately, the question of disability is a question of fact. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706; Ceasar v. Crispy Cajun Restaurant, 94-30 (La.App. 3rd Cir.10/5/94), 643 So.2d 471. If, upon review, an appellate court finds that a reversible error of law or a manifest error concerning the determination of a material fact was made by the trier of fact, then the court is required to determine the facts de novo from the entire record and render a judgment on the merits. Nichols v. Harmony Industrials, 96-1461 (La.App. 3rd Cir.4/2/97), 692 So.2d 701.
A review of this record discloses that the WCJ’s finding on the issue of causation was based on the preponderance of the evidence standard, which we conclude was the proper standard on that issue. Regarding the standard applied to |athe extent of Claimant’s disability, we reiterate that in order, to prove permanent and total disability, the evidence presented by Claimant must be clear and convincing. Since we dispose of the case on appeal on the issue of causation, the WCJ’s finding concerning permanent and total disability is moot; and we, therefore, pretermit any discussion on that issue.[5]
Since we find no evidence that the WCJ applied the wrong standard of proof, we decline to determine the facts of this case de novo. Thus, in this case, the appropriate standard of review to be applied by *862 this court is the “manifest error-clearly wrong standard.”

Assignment of Error No. 3: Causation

Medical experts may testify as to whether a condition was caused by a work-related accident; however, the ultimate determination of whether a plaintiff has proven causation is made by the courts and not by medical experts. Mitchell v. Abbeville General Hospital, 93-1146 (La.App. 3rd Cir.4/6/94), 635 So.2d 540. Causation is not necessarily a medical conclusion; courts must apply legal tests to the facts of the case to achieve a “just and equitable result.” Mitchell v. Abbeville General Hospital, supra.
The evidence presented establishes that Sawyer Industrial presented an environment in which its employees, including Claimant, were exposed to toxic chemicals. The evidence also establishes that several of the former employees complained of various physical symptoms during the time they were employed with Sawyer Industrial and after they left the plant.[6] Under the workers’ | mcompensation law, however, we are compelled to determine whether this Claimant has proved by a preponderance of the evidence that his disabling medical condition was caused by the exposure to chemicals while working at Sawyer Industrial. We find that Claimant failed to meet this burden; and, therefore, the WCJ’s finding to the contrary was manifest error.
After an intensive review of the testimony of the experts who testified in this case, the only evidence which relates Claimant’s medical problems to exposure to toxic chemicals is the testimony of Dr. Thomas Callender, which we find insufficient to carry Claimant’s burden on causation.
A. Testimony of Dr. Douglas Stoift
Dr. Swift is board-certified in occupational medicine and teaches at Tulane University. He concluded that Claimant’s symptoms were related to his weight as opposed to exposure to styrene, and recommended that Claimant lose weight. Dr. Swift also determined that Claimant had a normal exercise capacity and was physically able to engage in gainful employment. Dr. Swift did not believe the symptoms Claimant presented during his examination were related to exposure to toxic chemicals at work. Dr. Swift testified as follows:
Q: Do you feel like any — again, based on what your understanding is of his exposure and so forth, do you think any of those, as far as you could tell, would be the cause for his six complaints that you have listed?
A: I didn’t think that any of his current complaints were related to those exposure to any degree of probability from a causal point of view.
Q: Do you believe that — based on, again, history, review of the reports, et cetera, do you believe he has any illness related to his exposure to styrene and other chemical mentioned by him while he was working for Sawyer Industrial?
A: No. I wasn’t able to identify any.
| ^Additionally, Dr. Swift did not believe that Claimant suffered from toxic encephalopathy. Agreeing with Dr. Goebel, whose testimony is discussed below, Dr. Swift stated that brain dysfunction to one side of the brain only is inconsistent with toxic encephalopathy. Toxic exposure, according to Dr. Swift, causes damage to both sides of the brain because the blood that transports the toxins through the body flows equally to both sides of the brain. Dr. Swift described the traditional *863 symptoms of one suffering from toxic encephalopathy, noting that Claimant exhibited none of those symptoms.

B.Testimony of Dr. Ronald A. Goebel

Dr. Goebel has a masters and doctorate degree from Tulane University in psychology. He also has a post-doctorate fellowship in clinical neuropsychology. Dr. Goe-bel saw Claimant on February 25, 1997, and tested him on March 3 and 4, 1997. It was Dr. Goebel’s opinion that Claimant “probably has a mild degree of organic brain dysfunction in the right cerebral hemisphere.” Claimant’s brain dysfunction is slight at best; the result of the test for normal brain function indicated a score of 26 with normal function ranging from zero to 25 and mild brain dysfunction ranging from 26 to 42. Like Dr. Swift, Dr. Goebel opined that because Claimant exhibited dysfunction in the right hemisphere only, the brain impairment was not likely caused by any exposure to toxic chemicals. Dr. Goebel also agreed with Dr. Swift that Claimant did not exhibit any of the traditional symptoms of toxic encephalopathy: decreased attention, concentration and memory loss. Dr. Goebel stated that the “degree of claimant’s cognitive impairment is mild” and “does not disable him from gainful employment.” Dr. Goe-bel, however, also stated that Claimant’s “psychological limitations are very serious at this time and do preclude him from gainful employment.” Significantly, it was Dr. Goebel’s conclusion that Claimant’s disabling depression was not a |12result of injury from exposure to toxic chemicals, but rather the belief that he had been physically harmed by his exposure:
Q: Right, right. And then finally, you are of the opinion still, are you not, that his psychological impairment as you stated in your report and in your prior testimony on direct examination is related to his belief that he has been harmed physically by his exposure to toxic chemicals?
A: That makes the most sense to me, yes.
Dr. Goebel recommended that Claimant be evaluated by a psychiatrist to determine the cause of his problems.
C. Testimony of Dr. William Brooks Emory
Dr. Emory is a board-certified physician in internal medicine, pulmonary medicine and critical care medicine. His examination of Claimant revealed no physical abnormalities, including interstitial lung disease; however, Dr. Emory related any shortness of breath and sleep apnea (or fatigue) Claimant may have suffered to his obesity.
D. Testimony of Dr. T. Rick Irvin
Dr. Irvin testified on behalf of Claimant in an attempt to counter Dr. Goebel’s conclusions regarding causation. In his brief, Claimant expresses his interpretation of Dr. Irvin’s opinion in the following statement: “Dr. Irvin stated that testing showing damage to only one side of the brain cannot be used to rule out styrene as the etiology of the damage.” After careful review of Dr. Irvin’s entire testimony, we cannot agree with Claimant’s interpretation of his testimony. When asked about the issue of causation, Dr. Irvin testified as follows:
Q: If studies show or medical opinions are that there was damage to one’s brain after long term exposures to high levels of styrene, and the damage is located generally on one side, does that toxieologically rule out styrene as the etiology of the brain damage?
A: Are you referring — When you talk about one side, one side of the brain or are you talking about behavioral damage or actual cellular damage?
| iaQ: One side of the brain, say right hemispheric damage.
A: Okay. The literature is pretty consistent in saying that in laboratory animals that have been studied, styrene under chronic exposure is accessible to pretty much all the brain cells *864 and brain tissues, meaning it diffuses through the brain after a sufficient amount of time pretty consistently. The literature also is clear that different parts of the brain respond differently. Putting those two things together from the animal studies that are present because that’s all that we have, it would seem straightforward that while all the cells of the brain exposed to styrene might see certain damage, it might be different damage in different regions of the brain. Different kinds of damage might be repaired at different rates, and so that’s why while you might have diffuse movement of styrene throughout the brain, and diffused damage throughout the brain that when one was examined in terms of physiological examination or behavioral examination that there might be localization of certain damage that were manifested in how we could measure people because always 'remember you’re externally trying to determine what’s going on in there. So we test in certain ways.
[[Image here]]
The literature supports that all cells in the brain should be able to manifest styrene damage if one is exposed to chronic concentrations over a long enough period of time. The literature also support that you might evidence localized damage because certain kinds of that damage might be repaired slower or faster, and depending on what tests you do, you may or may not see that repair occur.
We find this testimony to be consistent with Dr. Goebel’s testimony in that both experts would expect diffuse brain damage from exposure to styrene over a long period of time. Dr. Irvin’s testimony does explain localized damage depending on the region of the brain and the rate of repair. This explanation, however, does not, in our opinion, support the ultimate conclusion that Claimant’s alleged brain impairment, manifested only in the right hemisphere of the brain, is the result of exposure to styrene. Nowhere in Dr. Irvin’s testimony does he express such a conclusion.
E. Testimony of Dr. Thomas Callender
Dr. Callender is board-certified in occupational medicine, environmental medicine and forensic medicine and was Claimant’s main expert physician. The first time Dr. Callender saw Claimant was more than two and one-half years after 114Claimant’s last exposure to chemicals at Sawyer Industrial. From April 3, 1995, to April 30, 1997, Claimant incurred bills with Dr. Cal-lender in an amount in excess of $58,000.[7] Very few of these charges were actually for treatment of Claimant’s alleged maladies. Dr. Callender diagnosed Claimant with toxic encephalopathy which, in his opinion, was caused by “exposure to multiple organic solvents in his workplace environment at Sawyer Plastics.” Dr. Callen-der further testified that he believed Claimant was totally and permanently disabled.[8] We find this evidence insufficient to support the WCJ’s finding that Claimant’s alleged maladies were causally related to his exposure to styrene while working at Sawyer Industrial.
As previously stated, in addition to the expert testimony, Claimant produced several witnesses who had been employed by Sawyer Industrial and who complained of exposure-related problems. We recognize that corroboration of the Claimant’s testimony may be provided by the testimony of fellow workers, spouses or friends. Cook *865 v. Kaldi’s Coffee House, 97-0979 (La.App. 4th Cir.1/28/98), 706 So.2d 1062. In the instant case, however, we find that the totality of the evidence does not render it more probable than not that Claimant’s alleged health problems stem from exposure to chemicals at Sawyer Industrial.[9]

Assignments of Error Nos. Jp, 5 and 6: Penalties and Attorney Fees; Credit to Defendants for benefits received by Claimant

Since we find insufficient proof on the issue of causation, we further find that Claimant is not entitled to penalties or attorney fees. Likewise, the issue of | ^Defendants’ entitlement to a credit for unemployment benefits received by Claimant is moot.[10]

Claimant’s Answer: Additional Attorney Fees and Expert Witness Fees

Claimant has answered this appeal seeking an increase in the award of attorney fees for post-trial work and legal effort on appeal. An increase in attorney fees is usually awarded when the defendant appeals and does not obtain relief, and when the appeal has necessitated additional work on the part of the plaintiffs counsel, provided that the plaintiff has requested the increase in accordance with proper appellate procedure. Miller v. City of New Orleans, 95-1006 (La.App. 4th Cir.12/14/95), 665 So.2d 1293. In light of our findings on appeal, Claimant is not entitled to additional attorney fees for work conducted in association with the appeal.
Defendants argue that the WCJ erred in awarding Claimant expert witness fees after the judgment on the merits was final and, further, in awarding unreasonable expert witness fees. This issue is also moot, in light of our reversal of the judgment of the WCJ.
DECREE
For the reasons stated herein, the judgment of the WCJ is reversed. Costs of this appeal are assessed to Claimant.
REVERSED.
NORRIS, J., dissents for reasons assigned by J. WILLIAMS.
WILLIAMS, J., dissents with written reasons.

. The term "lay-up” refers to the manufacturing of plastic boards. A mixer is a person who mixes the chemicals in preparation of manufacturing the boards. Resin, micro-crystal graphite, cobalt nathinate and methyl ethyl ketone peroxide were chemicals used in the mixing process.

. According to Claimant, prior to seeing a doctor for the symptoms that he alleges were a result of his work environment, he had seen a Dr. Shannon for a sinus infection. The doctor prescribed pain medicine for his shoulder and an appetite suppressant.

. Claimant stood 6' 3” tall and weighed approximately 395 pounds.

. While causation of a purely mental injury must be proven by clear and convincing evi *861 dence, La. R.S. 23:1021(7)(c), we find that any brain impairment suffered by Claimant in this case is a physical injury which may or may not have caused his mental condition. As such, causation of his alleged brain injury shall be governed by the preponderance of the evidence standard.

. We note, nonetheless, that we find nothing in the record from which this court can conclude that the judge used any standard other than the clear and convincing evidence standard to determine the extent of Claimant's disability. See, Moody v. Terry's Roofing & Sheet Metal, Inc., 552 So.2d 624 (La.App.2d Cir.1989).

. In the present case, Dr. Bryan L. Roberts, a toxicologist, was hired by Sawyer Industrial to conduct tests to determine the emission levels of the chemicals used at the plant. Dr. Roberts reported that workers were exposed to relatively high concentrations of styrene vapors during the lay-ups operation, especially those who were ladling, pouring and rolling the resin used in the process. Several former employees of Sawyer Industrial, including Guy Owens, Larry Dunn and David Paul McCarty, testified regarding the work conditions during their employment at Sawyer Industrial.

. We note that Dr. Callender intervened in the lawsuit seeking the amount owed by Claimant to him.

. In addition to the testimony of experts, Claimant produced several witnesses who had worked at Sawyer Industrial and who complained of exposure-related maladies. As explained infra, however, we find this testimony unpersuasive on the issue of whether this Claimant's alleged maladies are a result of his exposure to chemicals while working at Sawyer Industrial.

. Three of Claimant’s co-workers were employed almost as long, if not longer than, Claimant without incident. Jackie Dunn began working for Sawyer Industrial in February 1991, Bryan Dunn in April 1989 and Mark Hedges in January 1986.

. We note, however, that under La. R.S. 23:1225(B), Sawyer Industrial would clearly be entitled to such credit and Claimant acknowledges such in his brief.