752 So.2d 950 (1999)
Patsy Ann HUGHES, Plaintiff-Appellant,
v.
DELPHI INTERIOR & LIGHTING SYSTEMS, Defendant-Appellee.
No. 32,524-WCA.
Court of Appeal of Louisiana, Second Circuit.
December 17, 1999.
Writ Denied March 17, 2000.
*952 Robert G. Foley, Monroe, for appellant.
Hudson, Potts & Bernstein by Brian P. Bowes, Monroe, for appellee.
Before STEWART, KOSTELKA and DREW, JJ.
STEWART, J.
In this workers' compensation case, the claimant. Patsy Ann Hughes. appeals a judgment in favor of the defendant, Delphi Interior & Lighting Systems, denying Hughes' request for workers' compensation benefits and other related expenses from August 15, 1994 through her retirement date in November 1997 for injuries sustained while employed by Delphi Interior. The workers' compensation judge ("WCJ") dismissed the claim with prejudice and assessed Hughes all costs. In the matter now before the court, Hughes appeals the judgment of the WCJ. We affirm.

FACTS
On March 9, 1982, Hughes injured her right knee by bumping it against a cabinet while working at the General Motors Guide Lamp Plant (now Delphi Interior & Lighting Systems) in Monroe. On June 5, 1982, Hughes re-injured her right knee while entering her car to leave a picnic. Following proceedings, this court reversed a lower court ruling denying benefits, found that Hughes' second accident was an aggravation of the first injury, and awarded her workers' compensation benefits.
Throughout the 1980's, Hughes remained off of work at various periods and primarily received sickness and accident benefits for various medical reasons. As well, starting April 1990 Hughes remained off of work and received sickness and accident benefits through January 21, 1994. Hughes received workers' compensation benefits from January 25, 1991 through August 14, 1994. Hughes returned to sedentary work twice briefly in 1994 and 1996 and since that time she has received employer-sponsored disability and retirement benefits.
Since August 15, 1994, Hughes has experienced many health problems and has been involved in several accidents that were not work-related. On July 28, 1994, Dr. Baer Rambach, Hughes' primary orthopaedic physician, found that Hughes had reached maximum medical improvement. As such, he released her to return to work, effective August 15, 1994, with restrictions. Within less than one day after returning to work, Hughes suffered another accident by allegedly falling off of a stool. Still, on September 26, 1994, Hughes suffered another accident when she fell down stairs at her sister's home.
Hughes was examined by Dr. C.R. Hand, an orthopaedic surgeon, on January 18, 1995. Dr. Hand opined that Hughes was able to return to work as long as the job did not involve repeated squatting, bending, climbing, prolonged standing or walking. On October 25, 1995, during a visit to Dr. Gordon Massengale, Hughes' family physician, Hughes did not complain of knee problems. However, following a November 13, 1995 examination of Hughes performed by Dr. A.E. Dean, another orthopaedic surgeon, Dr. Dean diagnosed Hughes as having degenerative arthritis of the right knee. He released her to return to work with restrictions of alternating sitting, standing, and carrying no more than 20-25 pounds.
In January 1996, Hughes briefly returned to work, this time holding a position on an assembly line. This position only lasted three days due to Hughes' complaints that her knee continuously bumped the work table. Janet Papworth, a vocational rehabilitation counselor, reviewed *953 the position and found that it complied with Hughes' medical restrictions. Dr. Dean agreed with this job analysis. However, upon review of the job analysis in March 1997, Dr. Rambach found that Hughes could not work in the position on the assembly line due to her knee injury and complaints of pain.
On February 28, 1996, Hughes returned to Dr. Dean who, in turn, released her to return to work with the same restrictions. Dr. Dean found no relationship between her current condition of knee problems and a workplace accident. Instead, Dr. Dean again diagnosed Hughes as having degenerative arthritis in the right knee.
On February 21, 1995, after alleging chest pain, Hughes initiated treatment with a Monroe cardiologist, Dr. David Burkett. On March 6, 1996, during a return visit, Dr. Burkett performed a stress test using treadmill exercises. Hughes was able to remain on the treadmill for seven (7) minutes, achieving 93% of her predicted maximum heart rate response for her age. Another stress test, which was administered by Dr. Burkett, revealed the same results. Dr. Burkett noted that Hughes had "good physical tolerance for graded aerobic exercise."
Dr. Rambach opines that Hughes' disability is related to the 1982 accident. Based on his examination of Hughes on March 17, 1997, Dr. Rambach feels that Hughes is unable to return to any gainful employment.

DISCUSSION

Standard of Proof and Permanent and Total Disability
By her first two assignments of error, Hughes contends that the WCJ erred in applying an improper standard of proof as to the extent of her injury since her first injury occurred prior to the 1983 amendments. Hughes argues that under the more lenient "preponderance of the evidence" standard in effect in 1982 as opposed to the "clear and convincing evidence" standard, this court should grant Hughes' request for workers' compensation benefits.
In 1983, the legislature amended La. R.S. 23:1221(2)(c) which now requires a claimant seeking workers' compensation benefits to prove by clear and convincing evidence unaided by any presumption of disability that she is physically unable to engage in any employment. However, prior to the sweeping reform legislation of 1983, that provision provided that a claimant who could only work in pain was entitled to receive permanent and total disability benefits so long as she could prove her inability to engage in any gainful occupation by a preponderance of the evidence. (Our emphasis added.)
The law applicable to a workers' compensation claim is that which was in effect at the time of the injury. Kennedy v. Security Industrial Insurance Company, 623 So.2d 174 (La.App. 1st Cir.1993); Brock v. Morton Goldberg Auction Galleries, Inc. 631 So.2d 512 (La.App. 4th Cir. 1994); Bruno v. Harbert Intern. Inc., 593 So.2d 357 (La.1992). Where a statutory amendment setting forth a clear and convincing standard of proof in a workers' compensation case did not become effective until after claimant was injured, it is deemed to be error for a hearing officer to require the claimant to meet a clear and convincing standard, rather than the prior preponderance of the evidence standard. Brock, supra.
Furthermore, the manifest error standard of review is applicable to the factual determinations of an Administrative Hearing Officer in workers' compensation proceedings. Kennedy, supra; Edwards v. Sawyer Industrial Plastics, Inc., 739 So.2d 856 (La.App. 2nd Cir.1999). In the Written Reasons for Judgment, the WCJ relied upon La.R.S. 23:1221(c) as amended in 1983, indicating that claimant failed to prove by clear and convincing evidence that she was physically unable to engage in any gainful employment, unaided *954 by any presumption of disability. (Our emphasis added.) However, the law in effect in 1982, the date of Hughes' initial knee injury, required that the claimant prove permanent total disability to engage in any gainful occupation by a preponderance of the evidence.
A claimant in a workers' compensation action has the burden of proving, by a preponderance of the evidence, that a work-related accident either caused or contributed to his disability. Edwards, supra; Bruno, supra. As such, in order for a determination to be reached as to which law applies in this instance, it is first necessary to assess whether Hughes' current condition is related to her initial workplace knee injury.
At trial, conflicting medical findings were offered as to whether Hughes' current condition is related to her initial injury of 1982. On March 18, 1997 at a deposition, Dr. Dean commented he did not feel that his diagnosis of Hughes' current situation, degenerative arthritis, was a workrelated condition. However, in a follow-up statement, Dr. Dean stated that Hughes' previous knee injuries and previous surgeries probably played a role in her development of arthritis.
Moreover, Dr. Rambach, Hughes' treating physician, stated that he believes Hughes' disability is related to the 1982 incident. He further indicated that Hughes suffers from a chronic aggravation of arthritis in the knee that stems from the 1983 injury. Based on these findings and the evidence presented at trial, we believe that a relationship exists between Hughes' current condition and the initial injury of 1982. As such, we find the WCJ erred in failing to apply the more lenient burden of proof by a preponderance since Hughes' injury occurred prior to the 1983 amendments.
But even though the proof by a preponderance standard is applicable in this instance, for the following reasons we believe that Hughes has not proven by the necessary preponderance that she is or was unable to perform any gainful occupation without pain. Thus, even though there was error in the hearing officer's recitation of the appropriate standard, it was harmless error. See Kennedy, supra.
Hughes contends that she has carried her burden and has shown via a preponderance of the evidence that she is disabled due to the continued pain and aggravation of her injured arthritic right knee. As such, she urges this court to grant her workers' compensation benefits from August 15, 1994, or at least December 4, 1994 until present.
Regarding the standard applied to determine the extent of Hughes' disability, we reiterate that in order to prove permanent and total disability in a workers' compensation action where the injury at issue occurred prior to the sweeping reform legislation of 1983, a claimant must prove by a preponderance of the evidence that she can only work in pain and that she is unable to engage in any gainful occupation.
After hearing evidence presented by both parties, the WCJ denied Hughes' request for workers' compensation benefits, finding that Hughes was not totally and permanently disabled due to the 1983 knee injury. In reaching this conclusion, the WCJ made the following conclusions:
Evidence indicates that claimant has not made valid attempts to return to the workforce. On the two occasions that she did return to work in 1994 and 1996, minimal effort was made and claimant appeared to have created problems that prevented her from returning to work. Furthermore, there is no evidence that claimant has sought employment with any other employer nor made any efforts to truly return to work.... Despite her release to return to work and findings of maximum medical improvement, she has not returned to work with any meaningful effort. This Court is of the impression that claimant simply does *955 not want to work and therefore she shall not be covered by the Workers' Compensation Act of the State of Louisiana.
We find that the WCJ's determination is supported by enough of the record that she is not manifestly wrong. The evidence presented shows that on July 28, 1994, Dr. Rambach found that Hughes had reached "maximum medical improvement." As such, he released her to return to work, with restrictions. Upon Hughes' return to work in 1994, she was placed in a line position and reportedly worked less than one day before she fell off of a stool injuring her right ankle. Following this accident, Hughes was given a new position in an office setting with the duty of filing documents in cabinets.
After suffering yet another accident in September 1994 where Hughes reportedly fell down stairs at her sister's home, Dr. Hand examined Hughes and stated that she could return to work with certain restrictions. However, it was not until after Hughes was examined by both her treating physician, Dr. Massengale in October 1995 and by Dr. Dean in November 1995, who also released her to return to work with restrictions, that Hughes returned to work.
Upon her January 1996 return to work, the defendant placed Hughes in a position on an assembly line and within the restrictions of Dr. Dean. The position required Hughes to glue a small bubble lens on headlights which passed in front of her on a conveyor belt. Hughes' 1996 return lasted only three days due to her complaints that her knee kept bumping into the table. However, Janet Papworth, a vocational rehabilitation counselor, reviewed the assembly line position and found that it complied with the restrictions imposed by Dr. Dean. Furthermore, Papworth prepared a video tape of the position in order to depict its compliance with Hughes' medical restrictions. Papworth shared the job analysis and video tape with Dr. Dean for his review, and Dr. Dean signed off on the job analysis.
Dr. Rambach examined Hughes on March 17, 1997, the day before his trial deposition. Based on this examination, Dr. Rambach stated that he feels Hughes is unable to return to any gainful employment. Dr. Rambach determined that Hughes was totally disabled. During the deposition, Dr. Rambach reviewed the job analysis prepared by Papworth. Dr. Rambach disagreed with the analysis and stated that he did not believe Hughes could stand up for a prolonged time period. Incidentally, Dr. Rambach did not review the video tape which depicted the specific duty responsibilities required of the position given Hughes by the defendant. However, following Dr. Dean and Papworth's review of the video tape, they each indicated that they believed the assembly position involved light, low impact job responsibilities.
We do not believe that Dr. Rambach was fully aware of the vast array of jobs the defendant made available to Hughes. Along with Dr. Rambach's failure to view the video tape depicting the duties involved in Hughes' assembly line position, the evidence shows that during his March 1997 deposition, Dr. Rambach stated that he did not believe that Hughes could return to work and perform "janitorial" services. Hughes had not performed janitorial services for the defendant since her initial injury of 1983. The positions that the defendant made available to Hughes subsequent to the 1983 injury ranged from administrative office work to assembly line positions. Furthermore, we do not believe that Dr. Rambach was fully aware of Hughes' medical history. Dr. Rambach admitted that he "intermittently" treated Hughes for her knee problem since 1983. Accordingly, the evidence shows that a seven year lapse existed between his treatment of Hughes from 1983 until 1991. The WCJ rejected Dr. Rambach's position and stated in her Written Reasons for Judgment that "it is evident that Dr. Rambach was not aware of Claimant's work history nor the true nature of the jobs *956 provided for her by defendant." We agree with the WCJ's position.
Finally, Hughes' February 1995 and October 1996 visits to Monroe cardiologist Dr. David Burkett further exemplify her fitness and ability to continue employment, even though restrictions may apply. On the two occasions just noted, Dr. Burkett administered stress tests using a treadmill intended to increase Hughes' heart rate. Dr. Burkett found that Hughes achieved 93% of her predicted maximum heart rate response for her age. The second test, performed in October 1996 essentially revealed the same results. Dr. Burkett commented that Hughes had "good physical tolerance for graded aerobic exercise." These test results reinforce our belief that Hughes is simply not totally disabled so as to come within the confines of our workers' compensation laws. The WCJ's application of the clear and convincing evidence standard, although erroneous, was harmless error.
After careful review of the record we find that Hughes failed to prove, by a preponderance of the evidence, that she is permanently and totally disabled such that she is unable to engage in any gainful occupation. In her Written Reasons for Judgment, the WCJ expressed concern for Hughes' credibility regarding her true intent and desire to return to work, as well as her genuine efforts to remain employed. Moreover, we believe, as did the WCJ, that Hughes has "made a career out of this knee injury." Therefore, except for the harmless error regarding the applicable standard of proof, we find no merit to this assignment of error.

Penalties and Attorney Fees
Hughes contends that the defendant is liable for penalties and attorney fees. Hughes argues that the defendant was arbitrary and capricious in failing to continue to pay benefits and medical expenses past August 15, 1994 to the date of trial or at least, until November 1, 1997.
Where there is a serious defense presented in good faith, the assessment of attorney fees and statutory penalties is not appropriate. Johnson v. Fidelity & Cas. Ins. Co. of New York, 618 So.2d 651 (La.App. 2nd Cir.1993); Tucker v. Associated Grocers, Inc., 473 So.2d 328 (La.App. 1st Cir.1985). Whether or not a termination of or refusal to pay benefits is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer or insurer at the time. Johnson, supra. Furthermore, an employer is not arbitrary or capricious in terminating benefits if it had a reasonable factual basis for doing so. Crawford v. Al Smith Plumbing and Heating Service, Inc., 352 So.2d 669 (La.1977).
The defendant's denial of workers' compensation benefits in favor of Hughes was neither arbitrary nor capricious. The record indicates that the defendant had ample reason to contest Hughes' claimed disability. Based on conflicting testimony offered by physicians regarding whether Hughes was totally disabled and unable to return to work, the defendant was reasonable in its denial of workers' compensation benefits. Furthermore, the WCJ denied any benefits to Hughes. Accordingly, we conclude that the defendant is not liable to Hughes for penalties or attorney's fees. Hughes' request for penalties and attorney's fees is without merit.

CONCLUSION
Based on the foregoing, except for the harmless error regarding the applicable standard of proof, we affirm the ruling of the WCJ.
AFFIRMED.